Majel M. Russell (MT Bar No. 4057)
Daniel S. Wenner (MT Bar No. 42335071)
Elk River Law Office, P.L.L.P.
P.O. Box 928
Billings, Montana 59101
Telephone: (406) 259-8611
Facsimile: (406) 259-3251
Email:mrussell@elkriverlaw.com
        dwenner@elkriverlaw.com
*Attorneys for the Assiniboine and Sioux Tribes of the Fort Peck Indian Reservation*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
GREAT FALLS DIVISION**

| | |
|---|---|
| THE ASSINIBOINE AND SIOUX TRIBES OF THE FORT PECK INIDAN RESERAVATION, <br><br> Plaintiffs, <br><br> v. <br><br> The U.S. DEPARTMENT OF THE INTERIOR; DAVID BERNHARDT, in his official capacity as Secretary of the Interior; the BUREAU OF LAND MANAGEMENT; JOHN MEHLHOFF, in his official capacity as the State Director of the Montana/Dakotas State Office of the Bureau of Land Management; the U.S. ARMY CORPS OF ENGINEERS; RYAN MCCARTHY; in his official capacity as Secretary of the Army; COLONEL JOHN L. HUDSON, P.E., in his official capacity as District Commander of the U.S. Army Corps of Engineers - Omaha District, <br><br> Defendants. | Civil No. <br><br><br><br> **PLAINTIFFS' COMPLAINT FOR DECLARATORY AND INJUNCTINE RELIEF** |

The Assiniboine and Sioux Tribes of the Fort Peck Indian Reservation

("Tribes") complains and alleges as follows:

1

## I. INTRODUCTION

1.     This is an action for declaratory and injunctive relief to set aside actions by the Secretary of the Interior on the recommendation of the Bureau of Land Management ("BLM"), and by the United States Army Corps of Engineers ("Corps") to authorize TransCanada Keystone Pipeline, LP ("TransCanada"), to construct and operate the 36-inch Keystone XL Pipeline ("Pipeline"). The Pipeline will carry heavy crude oil from the tar sands fields of western Canada, across certain federal land in Montana. The authorizations challenged in this action are the newest links in a chain of federal agency decisions that have favored TransCanada's desire to construct the Pipeline while ignoring, downplaying, or attempting to paper over the Tribes' longstanding concerns that the Pipeline poses an existential threat to its Reservation, trust resources, and people.

2.     TransCanada has a long and controversial history of attempting to obtain regulatory approvals for the Pipeline in the United States. The Tribes has repeatedly sought to protect its Reservation from the construction and operation of the Pipeline throughout the environmental review and regulatory process.

3.     In this action, the Tribes seeks to set aside the BLM's grant of a right of way to TransCanada for the Pipeline under the Mineral Leasing Act ("MLA"), 30 U.S.C. § 185, and the Corps' decision to permit TransCanada to use land managed by the Corps for the Pipeline under the Rivers and Harbors Act ("RHA"), 33 U.S.C.

§ 408 ("408 Permit"). These two permits will allow TransCanada to construct the Pipeline up to and under the Milk and Missouri Rivers in northeastern Montana, immediately upstream from where those two rivers join to form the southwestern boundary of the Fort Peck Indian Reservation ("Reservation").

4.     Congress established the Reservation in 1888 as a permanent home for the Tribes. Since that time, the Tribes has developed the Reservation as its permanent home to perpetuate its cultural and religious traditions, to exercise its hunting, fishing and gathering rights, to provide essential services to its members and the surrounding communities, and to sustain its members on land that was promised to it forever.

5.     The United States, in the exercise of its trust responsibility to the Tribes, has also facilitated the development of the Reservation as the Tribes' permanent home by funding and developing a series of systems that provide water on the Reservation. Over the last century, the United States has developed and operated the Fort Peck Irrigation Project, which has two intakes in the Missouri River ten and fourteen miles downstream of the proposed Pipeline. The Irrigation Project provides water to irrigate over 19,000 acres of land on the Reservation. In 2000, Congress authorized the construction of the Assiniboine and Sioux Rural Water Supply System ("ASRWSS") to ensure a safe and adequate water supply for the Reservation. The ASRWSS intake is in the Missouri River downstream of the

Pipeline and currently provides clean water to homes, schools, businesses, and religious institutions on the Reservation. The United States has a specific trust responsibility to protect the Irrigation Project and the ASRWSS.

6.     The Pipeline will pass approximately one-quarter mile from the Reservation boundary at its closest point, threatening the Reservation with catastrophic impacts in the event of a spill into the Missouri River. The construction of the Pipeline also threatens other severe impacts on the Reservation. Despite the Tribes' efforts to raise these concerns in the environmental review and regulatory process over at least the past six years, BLM and the Corps have refused to acknowledge, evaluate, and mitigate the potential catastrophic impacts posed by the Pipeline to the Reservation and the Tribes' trust resources.

7.     In many material ways, the Secretary, BLM, and the Corps violated both the United States' trust responsibility to the Tribes and the National Environmental Policy Act ("NEPA") when they approved the MLA right of way and 408 Permit challenged in this action.

8.     In particular, BLM and the Corps relied on a Final Supplemental Environmental Impact Statement issued in December 2019 ("2019 FSEIS"), a Final Supplemental Environmental Impact Statement from January 2014 ("2014 FSEIS"), and documents prepared by TransCanada's contractors that include irrational assumptions and do not adequately consider: (1) the catastrophic impacts an oil spill

into the Milk or Missouri Rivers would cause to the Reservation; (2) the environmental justice issues regarding disproportionate impacts on the Tribes; (3) protections and alternatives that could mitigate or avoid such harms; and (4) the indirect effects of TransCanada's construction activities that could exacerbate a crisis of missing and murdered indigenous women and girls in Montana. Since authorizing the Pipeline, BLM and the Corps have additionally failed to identify, evaluate, and mitigate the impacts on the Tribes of TransCanada's construction activities arising from the coronavirus disease 19 ("COVID-19") pandemic. BLM and the Corps have further failed to acknowledge and meet their specific fiduciary duties to protect the Irrigation Project and ASRWSS from the Pipeline.

9.    These numerous flaws render the MLA right of way and the 408 Permit invalid under federal law and the agencies' own regulations and guidance. In issuing these authorizations, Defendants failed to ensure an adequate level of protection for the Tribes and its resources, threatening the very existence of the Tribes' Reservation as a permanent home, as well as the federal infrastructure that utilizes the Tribes' federally reserved water rights to Missouri River water to fulfill the purposes of the Reservation.

## II. JURISDICTION AND VENUE

10.    This Court has subject matter jurisdiction over the action pursuant to 28 U.S.C. §§ 1331 and 1362. This action also states claims under the Administrative

Procedure Act, 5 U.S.C. §§ 701-706 ("APA"), which waives the United States' sovereign immunity for actions brought under the APA, *id.* § 702, and authorizes a federal court to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations," *id.* § 706(2)(A), (C).

11.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(e)(1) because Defendants are United States' agencies or officers sued in their official capacities, the Plaintiff resides in this district, and a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this district.

### III. PARTIES

12.    Plaintiff is a federally recognized Indian tribe with a governing body duly recognized by the Secretary of the Interior.  Indian Entities Recognized by and Eligible to Receive Services from the United States Bureau of Indian Affairs, 85 Fed. Reg. 5462, 5462 (Jan. 30, 2020).

13.    Defendant David Bernhardt is the Secretary of the Department of the Interior who is charged with the authority to grant rights of way for pipelines through federal lands under the Mineral Leasing Act, 30 U.S.C. § 185(a).  Defendant Bernhardt has charge and supervisory control over all operations of BLM.  43 U.S.C. § 1457(4).  On or about January 22, 2020, Defendant Bernhardt approved BLM's

decision to grant TransCanada a right of way and temporary use permit for the Pipeline on certain federally administered land in Montana.  Defendant Bernhardt is sued in his official capacity.

14.     Defendant United States Department of the Interior ("Interior") is an executive agency of the United States government charged with the management and conservation of federal lands and natural resources under its jurisdiction.

15.     Defendant John Mehlhoff is the State Director for the Montana/Dakotas State Office of the Bureau of Land Management ("BLM").  On or about January 22, 2020, Defendant Mehlhoff recommended that Defendant Bernhardt approve BLM's decision to grant TransCanada a right of way and temporary use permit for the Pipeline on certain federally administered land in Montana.  Defendant Mehlhoff is sued in his official capacity.

16.     Defendant BLM is an agency within the Department of the Interior responsible for managing public lands under its jurisdiction, *see* 43 U.S.C. § 2, including 44.4 miles of public land in Montana that will be used for the Pipeline.

17.     Defendant Ryan McCarthy is the Secretary of the Army.  Defendant McCarthy has charge and supervisory control over all operations of the U.S. Army Corps of Engineers ("Corps").  *See* 10 U.S.C. § 7013(b).  Defendant McCarthy is sued in his official capacity.

18.     Defendant John L. Hudson is the Commander of the Omaha District for the U.S. Army Corps of Engineers.  On or about January 21, 2020, Defendant Hudson decided to permit the Pipeline's use of land managed by the Corps for the Fort Peck Dam and Reservoir Project under Section 14 of the Rivers and Harbors Act, 33 U.S.C. § 408.  Defendant Hudson is sued in his official capacity.

19.     Defendant Corps is an agency within the Department of the Army, *see* 10 U.S.C. § 7063(a)(4), charged with granting permission for the use of land administered by the Corps for public works projects under Section 14 of the Rivers and Harbors Act, 33 U.S.C. § 408.

20.     Defendants Bernhardt, Interior, Mehlhoff, BLM, McCarthy, Hudson, and Corps are sometimes hereafter referred to collectively as "Defendants."

## IV. FACTS AND ALLEGATIONS

A.     <u>History of the Tribes and Establishment of the Fort Peck Reservation</u>.

21.     The Assiniboine and Sioux Tribes have resided in the northern Great Plains since time immemorial, including in what is now Montana.  The Tribes' livelihood was historically based on hunting game, gathering plants, and fishing. The Tribes' members relied on animals and plants for food, clothing, shelter, and cultural and religious purposes.  The Tribes' members, and the animals and plants that supported them, also relied, and currently rely on fresh water from the Missouri River.  The Missouri River specifically had and still has central importance to the

8

Tribes' cultural and religious practices, because water is an important part of the Tribes' religious and cultural ceremonies, because numerous religious and cultural sites are located in and on the River, and because the Tribes traditionally understand the River itself to be a sacred, sentient being that supports other sacred beings in and around it.

22.     By the Act of April 15, 1874, ch. 96, 18 Stat. 28, 28-29 ("1874 Act"), Congress set aside a 20 million-acre reservation for "the use and occupation of" a number of Indian tribes, including the Plaintiff Tribes, in what is now Montana north of the Missouri River, east of the Continental Divide, and south of the Canadian border.  The Tribes continued to reside on this Reservation after it was established, and relied on its resources—including its animals, plants, and water—for survival.

23.     By the Act of May 15, 1886, ch. 333, 24 Stat. 29, 44, Congress directed the Secretary of the Interior to negotiate with the tribes occupying the Reservation created by the 1874 Act to secure a substantial land cession from those tribes prior to admission of Montana as a state.  By virtually identical agreements entered into in 1886 and 1887, the various tribes ceded major portions of the 1874 Act Reservation to the United States, retaining three smaller and separate reservations—the present-day Fort Peck, Fort Belknap, and Blackfeet Indian Reservations. Congress ratified these agreements by the Act of May 1, 1888, ch. 213, 25 Stat. 113 ("1888 Act").  In those congressionally ratified agreements, the United States agreed

9

that the Reservations would be "permanent homes" for the Indians that would provide them with "the means to enable them to become self-supporting . . . ." *Id.* at 113.

24.     The 1888 Act established the southern boundary of the separate Fort Peck Indian Reservation in northeastern Montana as follows: "[b]eginning at a point in the middle of the main channel of the Missouri River opposite the mouth of Big Muddy Creek; thence up the Missouri River, in the middle of the main channel thereof, to a point opposite the mouth of Milk River; thence up the middle of the main channel of Milk River . . . ." *Id.* at 116.  These boundaries established a Reservation that includes a substantial part of the bed and waters of the Missouri River between the Big Muddy Creek and Milk River.  Congress has never altered or diminished these boundaries.

25.     In total, the Reservation contains about 2.1 million acres, approximately 1 million acres of which—including the northern portion of the bed of the Missouri River—are now owned by the United States in trust for the Tribes or for individual Indians.   Approximately 7,100 tribal members live on the Reservation today.  Despite the large size of the Reservation, the vast majority of tribal members currently live on the southern portion of the Reservation, within five miles of the Missouri River.  Most of the towns and settlements on the Reservation are located within two miles of the Missouri River, including Poplar, which is the

10

seat of Tribal government, and Wolf Point, which is the county seat of Roosevelt County.

26.     The Tribes holds rights to hunt, fish, and gather within the Reservation. *See Menominee Tribe of Indians v. United States*, 391 U.S. 404, 405-07 (1968) (treaty setting aside lands for a tribe included hunting, fishing, and gather rights even though treaty was silent regarding those rights); *United States v. Dion*, 476 U.S. 734, 738 (1986) ("Indians enjoy exclusive treaty rights to hunt and fish on lands reserved to them . . . [and] [t]hese rights need not be expressly mentioned in the treaty.").  In exercising these rights, the Tribes' members continue to rely on the resources in and near the Missouri River for subsistence purposes and cultural practices.  The Tribes' members hunt mule deer in the Missouri River bottoms within the Reservation, including the area immediately downstream from the Pipeline's proposed crossing of the Missouri River.  The Tribes' members also hunt ducks, geese, and pheasants that live or migrate through the Missouri River bottoms on the Reservation.  Tribal members continue to gather plants at the Missouri River bottoms and fish in the Missouri River.  Tribal elders also rely on others to hunt and gather food for them in the area immediately downstream from the Pipeline's proposed Missouri River crossing to supplement their fixed incomes.

B.    The Development of Water Projects on the Reservation.

27.    The United States has, in the exercise of its trust responsibility and in order to maintain and improve the Reservation as a permanent homeland for the Tribes, developed a series of systems that provide water on the Reservation to tribal members and other residents of the Reservation.  These sources of water are necessary for the maintenance and development of the Reservation as a permanent home for the Tribes' members and the tribal economy.

28.    In *Winters v. United States*, 207 U.S. 564 (1908), the United States Supreme Court established the fundamental principle that, when the United States withdraws land from the public domain and reserves it for a purpose, by implication unappropriated water is reserved to accomplish the purpose of the reservation. *Winters* specifically involved the Fort Belknap Indian Reservation, which the Supreme Court found set aside under the 1888 Act as "a permanent home and abiding place" for two tribes.  *Id*. at 565.  In deciding whether the tribes in that case were entitled to water for irrigation purposes, the Court in *Winters* determined that the Fort Belknap Indian Reservation "lands were arid, and, without irrigation, were practically valueless," *id*. at 576, and that the 1888 Act's creation of the Reservation impliedly reserved a right to a sufficient amount of water to make the Reservation "valuable or adequate" for uses "which would be necessarily continued through the years," *id*. at 576-77.  The same 1888 Act that established the Fort Belknap Indian

12

Reservation involved in *Winters* established the Fort Peck Indian Reservation and ratified virtually identical contemporaneous agreements with both the Fort Belknap and Fort Peck Tribes.

29.     About five months after the Supreme Court decided *Winters*, Congress authorized construction of the Fort Peck Irrigation Project ("Irrigation Project"). *See* Act of May 30, 1908, ch. 237, § 2, 35 Stat. 558, 558 ("1908 Act"). Congress authorized the Irrigation Project to allow for irrigated agriculture by members of the Tribes on the Reservation to make the Reservation lands more valuable.  Congress thereafter appropriated funds for construction of the Irrigation Project. *E.g.*, Act of Aug. 24, 1912, ch. 388, § 10, 37 Stat. 518, 526; Act of June 30, 1913, ch. 4, § 10, 38 Stat. 77, 90.  The Irrigation Project's basic infrastructure has been in operation for over a century, with periodic modifications to pumping equipment to reflect advances in technology.  The Irrigation Project currently provides irrigation water to approximately 19,000 acres of land on the Reservation.

30.     The Irrigation Project diverts all its water for irrigation from the Missouri River at two intakes located on the Reservation at Wiota and Frazer, which are only ten and fourteen miles, respectively, downstream from the Pipeline's proposed crossing of the Missouri River.  The Irrigation Project uses a flood irrigation technique, under which the Project pumps water from the Missouri River through pipes to croplands, where the water is distributed over the soil by force of

gravity.  The Irrigation Project is the sole source of irrigation water for tribal members on the Reservation and supports a substantial portion of the Reservation's economic activity.

31.    In 1985, the Tribes, assisted by the U.S. Departments of Justice and the Interior, negotiated the Fort Peck-Montana Water Compact ("Compact") with the State of Montana to settle water rights adjudications of the Tribes' water rights that were then pending in state and federal courts and to quantify the water rights reserved to the Tribes under the principles enunciated in the *Winters* case.  The Compact was approved by the U.S. Departments of Justice and the Interior, ratified in 1985 by the Fort Peck Tribal Executive Board and the State of Montana, *see* Mont. Code Ann. § 85-20-201, and approved and confirmed by the Montana Water Court in 2001, *see In re Adjudication of Existing & Reserved Rights to the Use of Water*, No. WC-92-1, 2001 WL 36525512 (Mont. Water Ct. Aug. 10, 2001).

32.    Article III(A) of the Compact quantifies the Tribes' reserved water rights as the right to divert annually from the Missouri River and its tributaries "the lesser of (i) 1,050,472 acre-feet of water, or (ii) the quantity of water necessary to supply a consumptive use of 525,236 acre-feet per year," provided that the Tribes diverts "no more than 950,000 acre-feet of water, or the quantity of water necessary to supply a consumptive use of 475,000 acre-feet," from surface water in any one year.  Mont. Code Ann. § 85-20-201.

33.    In 2000, Congress passed the Fort Peck Reservation Rural Water System Act of 2000, Pub. L. No. 106-382, 114 Stat. 1451 ("2000 Act"), utilizing a portion of the Tribes' reserved water rights quantified in the Compact.  A purpose of the 2000 Act is "to ensure a safe and adequate municipal, rural, and industrial water supply for the residents of the Fort Peck Indian Reservation."  *Id.* § 2, 114 Stat. at 1451.  The 2000 Act provides that the Secretary of the Interior "shall plan, design, construct, operate, maintain, and replace a municipal, rural, and industrial water system, to be known as the 'Assiniboine and Sioux Rural Water System'," *id.* § 4(a), 114 Stat. at 1452, i.e., the ASRWSS.  As authorized by Congress, the ASRWSS provides water to users on the Reservation.  *Id.* § 4(d), 114 Stat. at 1453. The ASRWSS consists of:

> (1) pumping and treatment facilities located along the Missouri River within the boundaries of the Fort Peck Indian Reservation;
>
> (2) pipelines extending from the water treatment plant throughout the Fort Peck Indian Reservation;
>
> (3) distribution and treatment facilities to serve the needs of the Fort Peck Indian Reservation, including—
>
>> (A) public water systems in existence on the date of the enactment of this Act that may be purchased, improved, and repaired in accordance with the cooperative agreement entered into under subsection (c); and
>>
>> (B) water systems owned by individual tribal members and other residents of the Fort Peck Indian Reservation;
>
> (4) appurtenant buildings and access roads;
>
> (5) all property and property rights necessary for the facilities described in this subsection; . . . and

> (7) such other pipelines, pumping plants, and facilities as the Secretary
> determines to be appropriate to meet the water supply, economic, public
> health, and environmental needs of the Fort Peck Indian Reservation,
> including water storage tanks, water lines, and other facilities for the
> Fort Peck Tribes and the villages, towns, and municipalities in the Fort
> Peck Indian Reservation.

*Id.* § 4(b), 114 Stat. at 1452.

34.     The 2000 Act acknowledges that the operation and maintenance of the
ASRWSS must meet conditions "that are adequate to fulfill the obligations of the
United States to the Fort Peck Tribes." *Id.* § 4(c)(4)(B), 114 Stat. at 1453. Title to
the ASRWSS "shall be held in trust by the United States for the Fort Peck Tribes
and shall not be transferred unless a transfer is authorized by an Act of Congress
enacted after the date of the enactment of [the 2000 Act]." *Id.* § 4(f). Congress has
never retreated from its commitment to meet its trust responsibilities to provide
water to the Tribes nor has it authorized the transfer of title to the ASRWSS to any
other entity.

35.     The ASRWSS diverts water from the Missouri River under the Tribes'
water right guaranteed by the Compact. Operating under the terms of the 2000 Act,
the ASRWSS delivers potable water for municipal, residential, commercial, and
industrial purposes on the Reservation, providing clean, safe drinking water to
homes, schools, religious and cultural institutions, hospitals, and businesses on the
Reservation. It also provides water for the operation of tribal governmental services

and tribal enterprises, as well as to the county and municipal governments that provide services to tribal members and non-Indians on the Reservation.

36.     The ASRWSS intake is in the Missouri River, fifty-seven river miles downstream from the Pipeline's proposed Missouri River crossing.  The water is piped through ASRWSS pipelines throughout the Reservation.  Those pipelines also connect to the Dry Prairie Rural Water System, which provides water to a service area outside of the Reservation.  *Id.* § 5(d)(2), 114 Stat. at 1455.  When fully completed in the early 2020s, these water systems will have been funded by Congress in the amount of approximately $302 million and will supply water to 31,200 people in Daniels, Roosevelt, Sheridan, and Valley Counties and on the Reservation.

37.     The Missouri River water pumped through the Irrigation Project and the ASRWSS is the only reliable source of fresh water on the Reservation.  Due to the pollution of groundwater and other sources of surface water on and near the Reservation by prior oil and gas development, there is no other reliable source of fresh water for tribal members.

C.     The Proposed Pipeline.

38.     TransCanada is a limited partnership registered in Delaware and headquartered in Houston, Texas.  TransCanada's entire purpose is to design, construct, and operate oil and gas pipelines in the United States.  TransCanada is

owned and controlled, through a number of subsidiary entities, by TC Energy Corporation. TC Energy Corporation is a Canadian company headquartered in Calgary, Alberta, Canada which directs TransCanada's operations to benefit itself and, ultimately, its shareholders. These entities are collectively referred to herein as "TransCanada."

39.     TransCanada proposes to construct, operate, and maintain the Pipeline to transport crude oil across the U.S./Canada border to Steele City, Nebraska. The Pipeline would connect to the existing Keystone Cushing Extension pipeline, already in place, which extends from Steele City, Nebraska, to Cushing, Oklahoma. In total, the proposed Pipeline would consist of approximately 1,209 miles of new, 36-inch-diameter pipeline, with approximately 327 miles of pipeline in Canada and approximately 882 miles in the United States. The Pipeline is proposed to cross the international border near Morgan, Montana and follow a route through Montana, South Dakota, and Nebraska. The proposed Pipeline route will cross the Missouri River in Montana approximately one-quarter mile upstream of the southwestern boundary of the Fort Peck Reservation. The proposed Pipeline route in Montana includes 44.4 miles located on federal land administered by the BLM and 1.88 miles of federal land near Fort Peck Dam administered by the Corps.

40.     During construction, TransCanada will require a 110-foot-wide temporary right of way ("ROW"), for the construction area for the Pipeline and for

work areas.  After construction, the Pipeline will require a fifty-foot-wide ROW, which will last as long as the Pipeline is in operation.

41.     The Pipeline will carry three types of oil: conventional light crude oil derived from the Bakken formation, synthetic crude oil composed of partially refined bitumen, and diluted bitumen, or "dilbit," derived from western Canadian oil sand deposits.

42.     The vast majority of oil transported through the Pipeline will be dilbit. Dilbit is the densest and most viscous of the three types of oil, so much so that in order to flow through a pipeline it must be diluted with a lighter material, such as natural gas condensate, naphtha, or a mixture of other light hydrocarbons.  Dilbit has different properties than other oils, even heavy crude oils, which make it especially dangerous for the Irrigation Project and ASRWSS if it is accidentally released into the Missouri River during a spill or other incident.

43.     In particular, once dilbit is exposed to the environment it undergoes a process called "weathering."  During weathering, the diluents in the dilbit evaporate at a significantly higher rate than the heavy compounds of the bitumen.  This increases the density of the bitumen so that it exceeds the density of water and sinks. Additionally, in a highly turbid river, like the Missouri, bitumen will adhere to particulate matter in the water.  These conglomerates of oil, sediment, and organic matter will be suspended in the River or sink to the bottom, where they can collect

in deposits on the streambed and "become a continual source of contamination as stream flow continues to distribute them."  U.S. Dep't of State, *Final Supplemental Environmental Impact Statement for the Keystone XL Project, Vol. I* at 5-20 (2019) ("2019 FSEIS").[1]

44.    Once it sinks into a water body, bitumen is hard to detect because it is hard to see from above the surface and may be mistaken for aquatic vegetation or vice versa.  In addition, removing sunken bitumen is much more difficult than removing lighter oil—especially in a large river like the Missouri.  And bitumen also disperses in the environment more slowly than other types of oil, meaning it can persist in the environment far longer than other oils might.  Consequently, dilbit that spills into the River from the Pipeline will likely remain there for long periods unless it is removed, and removal would be unusually difficult.

45.    The Pipeline as authorized by the Secretary of the Interior and the Corps would, unless enjoined by this Court, cross the Missouri River approximately one-quarter mile upstream from the southwestern boundary of the Fort Peck Reservation. The Pipeline would also cross the Milk River approximately eight river miles upstream from the western boundary of the Reservation and approximately twenty-four river miles upstream from where the Milk River flows into the Missouri River

---

[1]   https://www.state.gov/wp-content/uploads/2019/12/Vol-I-Keystone-Final-SEIS-Cover-through-Chapter-11_508-December-2019.pdf.

on the Reservation.  A spill of oil from the Pipeline into either the Milk or the Missouri Rivers threatens catastrophic impacts to the Tribes' Reservation and the exercise of its water rights in the federally authorized and funded Irrigation Project and ASRWSS.

> D.    The Law Applicable to the Proposed Pipeline.

46.    The Pipeline itself is subject to federal safety standards administered by the Pipeline and Hazardous Materials Safety Administration ("PHMSA") for pipelines that transport hazardous liquids such as crude oil.  49 C.F.R. pt. 195. PHMSA is an agency within the U.S. Department of Transportation, which derives its authority to regulate the safety of hazardous liquid pipelines from the Hazardous Liquid Pipeline Safety Act of 1979, Pub. L. No. 96-129, 93 Stat. 989.  PHMSA's regulations provide enhanced protection for "high consequence areas" by requiring higher levels of inspection and repair criteria. *See* 49 C.F.R. § 195.452.  These more stringent requirements apply to each section of a pipeline "that could affect a high consequence area . . . unless the operator effectively demonstrates by risk assessment that the pipeline could not affect the area." *Id.* § 195.452(a).  A "high consequence area" includes, *inter alia*, an "unusually sensitive area."  *Id.* § 195.450.   An "unusually sensitive area" includes, *inter alia*, a "water intake for a Community Water System . . . that obtains its water supply primarily from a surface water source and does not have an adequate alternative drinking water source." *Id.* § 195.6(a)(1).

The area around the ASRWSS intake on the Missouri River is such a "high consequence area."

47.     Because the proposed Pipeline and ROW would cross federally owned and administered land in Montana, TransCanada must obtain a ROW for the Pipeline under Section 28 of the Mineral Leasing Act ("MLA"), 30 U.S.C. § 185.  BLM typically issues these ROWs for BLM-administered lands.  In this case, the BLM considered a ROW application from TransCanada, determined it should be approved, and recommended that the Secretary actually approve it.  This allowed BLM and the Secretary to avoid regulatory procedures that would normally give aggrieved parties the right to appeal the decision through an administrative proceeding.  *See* U.S. Dep't of the Interior, Bureau of Land Mgmt., Record of Decision 25-26 (Jan. 22, 2020) ("BLM ROD");[2] 43 C.F.R. §§ 4.331(b), 4.410(a)(3).

48.     When considering an application for a ROW, BLM must comply with both the MLA, 30 U.S.C. § 185, and its implementing regulations, 43 C.F.R. pt. 2880.

49.     Section 185 of the MLA provides that "[r]ights-of-way through any Federal lands may be granted by the Secretary of the Interior or appropriate agency head for pipeline purposes for the transportation of oil . . . or any refined product

---

[2]     https://eplanning.blm.gov/epl-front-office/projects/nepa/1503435/20011555/250015801/Keystone_ROD_Signed.pdf.

produced therefrom to any applicant possessing the qualifications provided in [30 U.S.C. § 181] in accordance with the provisions of this section." 30 U.S.C. § 185(a).

50.    Section 185 of the MLA further provides any ROW must comply with regulations or include stipulations

> which shall include . . . (C) requirements designed to control or prevent (i) damage to the environment (including damage to fish and wildlife habitat), (ii) damage to public or private property, and (iii) hazards to public health and safety; and (D) requirements to protect the interests of individuals living in the general area of the right-of-way or permit who rely on the fish, wildlife, and biotic resources of the area for subsistence purposes.

*Id.* § 185(h)(2).

51.    BLM shall grant a ROW only where it "is satisfied that the applicant has the technical and financial capability to construct, operate, maintain, and terminate the project for which the right-of-way or permit is requested in accordance with the requirements of this section." *Id.* § 185(j).  BLM must also ensure that the proposed ROW complies with applicable federal law.  43 C.F.R. § 2884.21(d)(2).

52.    Additionally, because the proposed ROW would cross land managed by the Corps, BLM must obtain the concurrence of the head of the Corps, *id.* § 2884.26, which the Corps provided for the ROW, BLM ROD at 1 (stating the Corps "concurs with the adoption of" the MLA Section 185 ROW).

53.    Because the proposed Pipeline route would cross under the Missouri River, which is a navigable river, TransCanada was also required to obtain the 408

permit from the Corps under Section 14 of the Rivers and Harbors Act ("RHA"), 33

U.S.C. § 408. The RHA makes it unlawful for any person to damage or impair a

public work built by the United States "for the preservation and improvement of any

of its navigable waters or to prevent floods . . . ." *Id.* § 408(a). However, the

Secretary of the Army, "on the recommendation of the Chief of Engineers [of the

Corps]," may "grant permission for the alteration or permanent occupation or use of

any of the aforementioned public works when in the judgment of the Secretary such

occupation or use will not be injurious to the public interest and will not impair the

usefulness of such work." *Id.*

54.     The Corps' public interest review is governed by the Department of the

Army's general policies for evaluating permit applications. 33 C.F.R. § 320.4(a);

*see id.* §§ 320.1(b), 320.2(e). These provide that:

> The decision whether to issue a permit will be based on an evaluation
> of the probable impacts, including cumulative impacts, of the proposed
> activity and its intended use on the public interest. Evaluation of the
> probable impact which the proposed activity may have on the public
> interest requires a careful weighing of all those factors which become
> relevant in each particular case. The benefits which reasonably may be
> expected to accrue from the proposal must be balanced against its
> reasonably foreseeable detriments. The decision whether to authorize a
> proposal, and if so, the conditions under which it will be allowed to
> occur, are therefore determined by the outcome of this general
> balancing process. That decision should reflect the national concern for
> both protection and utilization of important resources. All factors which
> may be relevant to the proposal must be considered including the
> cumulative effects thereof: among those are conservation, economics,
> aesthetics, general environmental concerns, wetlands, historic
> properties, fish and wildlife values, flood hazards, floodplain values,

> land use, navigation, shore erosion and accretion, recreation, water
> supply and conservation, water quality, energy needs, safety, food and
> fiber production, mineral needs, considerations of property ownership
> and, in general, the needs and welfare of the people.

*Id.* § 320.4(a)(1).   Additionally, the Corps must consider, "[w]here there are unresolved conflicts as to resource use, the practicability of using reasonable alternative locations and methods to accomplish the objective of the proposed structure or work . . . ." *Id.* § 320.4(a)(2)(ii).

55.   If a proposed permit or permission affects "areas which possess recognized historic, cultural, scenic, conservation, recreational or similar values," the Corps must also consider them in the public interest analysis.  *Id.* § 320.4(e). The regulations provide that

> [f]ull evaluation of the general public interest requires that due
> consideration be given to the effect which the proposed structure or
> activity may have on values such as those associated with . . .
> archeological resources, including Indian religious or cultural sites, and
> such other areas as may be established under federal or state law for
> similar and related purposes. Recognition of those values is often
> reflected by state, regional, or local land use classifications, or by
> similar federal controls or policies. Action on permit applications
> should, insofar as possible, be consistent with, and avoid significant
> adverse effects on the values or purposes for which those
> classifications, controls, or policies were established.

*Id.*

56.     The Corps' issuance of the 408 Permit and concurrence in the ROW is also governed by Circular No. 1165-2-220 (Sept. 10, 2018).[3]  *See* BLM ROD at 1 (stating the Corps' concurrence in the ROW was made "consistent with" Circular No. 1165-2-220).  The Circular provides that proposed alterations "will be reviewed to determine the probable impacts, including cumulative impacts, on the public interest."  Circular No. 1165-2-220 at 21.  The Corps' public interest determination "requires a careful weighing of all those factors that are relevant in each particular case."  *Id.*  Relevant factors "may include, but are not limited to, such things as conservation, economic development, historic properties, cultural resources, environmental impacts, water supply, water quality, flood hazards, floodplains, residual risk, induced damages, navigation, shore erosion or accretion, and recreation."  *Id.*

57.     Any action taken by the BLM or Corps under the MLA or RHA must comply with the requirements of the National Environmental Policy Act ("NEPA"), 42 U.S.C. ch. 55, and its implementing regulations, 40 C.F.R. pts. 1500-1508.  *See* 30 U.S.C. § 185(h)(1); 33 U.S.C. § 408(b)(1); 43 C.F.R. § 2884.21(d)(1).

58.     NEPA requires agencies to take a hard look at impacts that major federal actions will have on the human environment.   42 U.S.C. § 4332(C); *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 352 (1989).  Agencies

---

[3] https://www.mvs.usace.army.mil/Portals/54/EC_1165-2-220.pdf.

must have "considered the relevant factors and articulated a rational connection between the facts found and the choice made." *Baltimore Gas & Elec. Co. v. Nat. Res. Defense Council, Inc.*, 462 U.S. 87, 105 (1983).

59.     NEPA requires that the responsible official for a major federal action—which includes actions of non-government entities approved by federal permits, 40 C.F.R. § 1508.18(b)(4)—make a detailed statement on, *inter alia*, "(i) the environmental impact of the proposed action, (ii), any adverse environmental effects which cannot be avoided should the proposal be implemented, [and] (iii) alternatives to the proposed action . . . ." 42 U.S.C. § 4332(2)(C)(i)-(iii). Such a statement is made in an environmental impact statement ("EIS") prepared by the responsible agency. 40 C.F.R. § 1508.11.

60.     An agency may adopt an EIS or a portion thereof "provided that the statement or portion thereof meets the standards for an adequate statement" under NEPA's regulations. *Id.* § 1506.3(a). Additionally, a "cooperating agency may adopt without recirculating the environmental impact statement of a lead agency when, after an independent review of the statement, the cooperating agency concludes that its comments and suggestions have been satisfied." *Id.* § 1506.3(c). If the Corps intends to adopt another agency's NEPA document in support of a 408 permit, the Corps' Circular provides that the Corps must "re-evaluate information that is greater than 5 years old, prior to adoption or incorporation by reference for

the Section 408 permission decision." Circular No. 1165-2-220, App. D at D-7. The Corps "is still responsible for developing a Record of Decision . . . to document NEPA compliance for the Section 408 permission decision." *Id.* at D-7 to D-8; *see also* 33 C.F.R. § 230.14.

61.     Any EIS prepared under NEPA must discuss "the environmental impacts of the alternatives including the proposed action [and] any adverse environmental effects which cannot be avoided should the proposal be implemented . . . ." 40 C.F.R. § 1502.16. This discussion must include discussions of "[d]irect effects and their significance," "[i]ndirect effects and their significance," and "[m]eans to mitigate adverse environmental impacts . . . ." *Id.* § 1502.16(a)-(b), (h). An EIS "shall provide full and fair discussion of significant environmental impacts . . . ." *Id.* § 1502.1.

62.     "Effects" and "impacts" are synonymous. *Id.* § 1508.8. "Effects" may be

> ecological (such as the effects on natural resources and on the components, structures, and functioning of affected ecosystems), aesthetic, historic, cultural, economic, social, or health, whether direct, indirect, or cumulative. Effects may also include those resulting from actions which may have both beneficial and detrimental effects, even if on balance the agency believes that the effect will be beneficial.

*Id.*

63.     Effects may be "direct" or "indirect." "Direct effects" under NEPA are "caused by the action and occur at the same time and place." *Id.* § 1508.8(a).

"Indirect effects" "are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable." *Id.* § 1508.8(b). When a proposed federal action would have a primary impact on the natural environment, then the agency may consider secondary socio-economic effects from the project. *See Coal. of Concerned Citizens to Make Art Smart v. Fed. Transit Admin.*, 843 F.3d 886, 905 (10th Cir. 2016) (citing *Cure Land, LLC v. U.S. Dep't of Agric.*, 833 F.3d 1223, 1235 n.10 (10th Cir. 2016)); *see also Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 761 (2004) (listing environmental impact categories considered by agency in NEPA review process).

64.     A NEPA analysis must also analyze cumulative impacts of a federal action. Cumulative impacts result "from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions." 40 C.F.R. § 1508.7. "Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time." *Id.*

65.     NEPA requires agencies to take a hard look at measures to mitigate adverse environmental impacts and consequences and to explain their consideration of mitigation measures in the record of decision. *Id.* §§ 1502.16(h), 1505.2(c). NEPA requires "that mitigation be discussed in sufficient detail to ensure that

environmental consequences have been fairly evaluated." *Robertson*, 490 U.S. at 352.

66.    NEPA environmental review must also take account of principles of environmental justice, which recognize that human activities often have disproportionately negative effects on the resources, health, and welfare of historically disadvantaged populations.   Under Executive Order 12898, "each Federal agency shall make achieving environmental justice part of its mission by identifying and addressing, as appropriate, disproportionately high and adverse human health or environmental effects of its programs, policies, and activities on minority populations and low-income populations in the United States . . . ."  Exec. Order No. 12898, § 1-101, 59 Fed. Reg. 7629, 7629 (Feb. 11, 1994).

67.    Guidance from the Council on Environmental Quality ("CEQ") requires that mitigation measures "to avoid, mitigate, minimize, rectify, reduce, or eliminate the impact associated with a proposed agency action . . . should reflect the needs and preferences of affected low-income populations, minority populations, or Indian tribes to the extent practicable."  Council on Envtl. Quality, Exec. Office of the President, *Environmental Justice: Guidance Under the National Environmental Policy Act* 16 (1997) ("CEQ Guidance").[4]

---

[4]    https://www.epa.gov/sites/production/files/2015-02/documents/ej_guidance_nepa_ceq1297.pdf.

68.     Under CEQ guidance, disproportionate impacts to an Indian community or other population may occur as a result of that community's special historical, social, economic, cultural, or other significant connection to the natural environment.  *Id.* at 9.

69.     Agencies are required to consider "relevant public health data and industry data concerning the potential for multiple or cumulative exposure to human health or environmental hazards in the affected population and historical patterns of exposure to environmental hazards . . . ."  *Id.*  "Agencies should consider these multiple, or cumulative effects, even if certain effects are not within the control or subject to the discretion of the agency proposing the action."  *Id.*

70.     The "identification of a disproportionately high and adverse human health or environmental effect" on an Indian tribe "should heighten agency attention to alternatives (including alternative sites), mitigation strategies, monitoring needs, and preferences expressed by the affected community or population."  *Id.* at 10.

71.     Defendants also hold special obligations to the Tribes under the federal common law.  The United States "has charged itself with moral obligations of the highest responsibility and trust.  Its conduct, as disclosed in the acts of those who represent it in dealings with the Indians, should therefore be judged by the most exacting fiduciary standards."  *Seminole Nation v. United States*, 316 U.S. 286, 297 (1942).  The trust responsibility applies to actions of federal agencies, including

31

Defendants' actions regarding the Pipeline.  *See Nance v. EPA*, 645 F.2d 701, 711 (9th Cir. 1981) ("It is fairly clear that any Federal government action is subject to the United States' fiduciary responsibilities toward the Indian tribes."); *see also Covelo Indian Cmty. v. FERC*, 895 F.2d 581, 586 (9th Cir. 1990); *Nw. Sea Farms, Inc. v. U.S. Army Corps of Eng'rs*, 931 F. Supp. 1515, 1519-20 (W.D. Wash. 1996) (recognizing "that the [trust] duty extends to the Corps in the exercise of its permit decisions"); *Muckleshoot Indian Tribe v. Hall*, 698 F. Supp. 1504 (W.D. Wash. 1988); *Confederated Tribes of Umatilla Indian Reservation v. Alexander*, 440 F. Supp. 553 (D. Or. 1977).

72.    Congress recognized that this special trust responsibility also applies to Indian agricultural lands in the American Indian Agricultural Resource Management Act of 1993, 25 U.S.C. § 3701(2)-(3):

> [T]he United States has a trust responsibility to protect, conserve, utilize, and manage Indian agricultural lands consistent with its fiduciary obligation and its unique relationship with Indian tribes; [and] Indian agricultural lands are renewable and manageable natural resources which are vital to the economic, social, and cultural welfare of many Indian tribes and their members.

73.    Congress has declared, in the American Indian Religious Freedom Act of 1978, 42 U.S.C. § 1996 ("AIRFA"), that:

> it shall be the policy of the United States to protect and preserve for American Indians their inherent right of freedom to believe, express, and exercise the traditional religions of the American Indian . . . including but not limited to access to sites . . . and the freedom to worship through ceremonials and traditional rites.

The BLM's policy respecting AIRFA and Indian religious freedom is that "[d]uties pursuant to [AIRFA] fall under general administrative responsibilities such as planning and environmental review" and that it fulfills its responsibilities in the context of those regulatory functions, rather than through separate regulations.  *See* U.S. Dep't of the Interior, Bureau of Land Mgmt., *8120 - Tribal Consultation Under Cultural Resources* § .03(A) (Dec. 3, 2004).[5]  The Department of Defense has also recognized that it is obligated to meet the trust responsibilities to Indians that are established by AIRFA.  *See* U.S. Dep't of Def., *American Indian and Alaska Native Policy* § I, at 3 (Oct. 20, 1998).[6]  The Department of Defense's policies provide that the Corps will ensure it "address[es] tribal concerns related to protected tribal resources, tribal rights, or Indian lands."  *Id.*  The policies further provide that, "[u]nder the federal trust doctrine, the United States—and individual agencies of the federal government—owe a fiduciary duty to Indian tribes," and directs that, "[w]here agency actions may affect Indian lands . . . the trust duty includes a substantive duty to protect these lands and treaty rights 'to the fullest extent possible.'"  *Id.* at 3 n.(g).

---

[5]       https://www.blm.gov/sites/blm.gov/files/uploads/mediacenter_blmpolicy manual8120.pdf.

[6]       https://www.denix.osd.mil/na/policy/dod-policies/native-policy-1998/DoD %20American%20Indian%20and%20AK%20Native%20Policy_1998.pdf.

E.     The Agency Proceedings on TransCanada's Permits.

74.     Much of the NEPA review of the effects of the Pipeline was made in the context of the U.S. Department of State's decision whether to issue a Presidential Permit for the Pipeline's crossing of the U.S./Canada border.  BLM and the Corps would later adopt the Department of State's environmental impact statements to support their own actions regarding the Pipeline.  *See* 40 C.F.R. § 1506.3.

75.     In March 2008, TransCanada filed an application for a ROW from BLM.  Along with the ROW application, TransCanada submitted a proposed Plan of Development ("POD"), describing how TransCanada planned to construct, operate, maintain, and decommission the Pipeline and related facilities on the ROW.

76.     In September 2008, TransCanada filed an application for a Presidential Permit that would allow it to construct the Pipeline across the U.S./Canada border.

77.     The Department of State ("State"), which is responsible for reviewing applications for Presidential Permits, *see* 3 U.S.C. § 301, determined that it would be necessary to prepare an EIS under NEPA to evaluate the potential environmental impacts of the proposed Pipeline and various alternatives to the proposed Pipeline route.  State was the lead federal agency in the environmental review process, and BLM and the Corps were cooperating agencies.  *See* 40 C.F.R. § 1501.6.

78.     State prepared an EIS for the Pipeline, which it issued in 2011, that discussed the environmental impacts from the entire Pipeline.  Congress then

imposed a statutory deadline for consideration of the Presidential Permit application, requiring that it be approved unless the President determined approval was not in the "national interest."  *See* Temporary Payroll Tax Cut Continuation Act of 2011, § 501(a), (b)(1), Pub. L. No. 112-78, 125 Stat. 1280, 1289-90.  State denied the Presidential Permit in 2012, after President Barack Obama determined that it would not serve the national interest to grant the Presidential Permit within the short timeline set by Congress.  *See* In the Matter of the Keystone XL Pipeline, 77 Fed. Reg. 5614 (Feb. 3, 2012); Media Note, Office of the Spokesperson, Dep't of State, *Denial of the Keystone XL Pipeline Application* (Jan. 18, 2012).[7]

79.     Later in 2012, TransCanada proposed a new alignment for the Pipeline and filed a new application for a Presidential Permit.  TransCanada revised its ROW application and proposed POD to reflect changes to the proposed Pipeline route.

80.     State, with BLM and the Corps as cooperating agencies, supplemented the 2011 EIS and issued the 2014 FSEIS.  U.S. Dep't of State, Final Supplemental Environmental Impact Statement for the Keystone XL Project (Jan. 2014) ("2014 FSEIS").[8]  The 2014 FSEIS erroneously stated that the intake for the ASRWSS was "approximately 77 river miles downstream of the proposed Project crossing" of the Missouri River.   2014 FSEIS at 4.3-19.   In fact, the ASRWSS is located

---

[7] https://2009-2017.state.gov/r/pa/prs/ps/2012/01/181473.htm.

[8] https://2012-keystonepipeline-xl.state.gov/finalseis/index.htm.

approximately fifty-seven river miles downstream of the Pipeline's proposed crossing of the Missouri River.  The 2014 FSEIS also said the possibility of a spill reaching the ASRWSS's intake would be "exceptionally remote" based on a 2009 risk assessment in Appendix P of the 2014 FSEIS and a report prepared by Exponent, TransCanada's contractor, in its Third-Party Consultant Environmental Review of the TransCanada Keystone XL Pipeline Risk Assessment (Apr. 26, 2013) ("Exponent Report").[9]  2014 FSEIS at 4.3-19.

81.     Based on the Exponent Report, the 2014 FSEIS said "[a] buffer distance of 10 miles downstream has been selected for impact evaluation in the FEIS and Final Supplemental EIS process."  2014 FSEIS at 4.3-19.  However, the Exponent Report only analyzed the potential downstream transport distance of crude oil in small streams less than 100 feet wide, not large rivers like the Missouri River with a substantially higher flow velocity.  *See* Exponent Report at xiv.  The Exponent Report was plainly inadequate to estimate how far crude oil would travel in a major river.  Yet the 2014 FSEIS relied on the Exponent Report to say that "[t]he distance from the pipeline crossing to the ASRWSS intake is over 70 miles," which is "significantly beyond the proposed Project impact assessment buffer."  2014 FSEIS at 4.3-19.  The Tribes commented on the 2014 FSEIS and raised concerns regarding

---

[9] https://2012-keystonepipeline-xl.state.gov/documents/organization/221278.pdf.

the Pipeline's proximity to the Reservation and the potential catastrophic impacts of a spill on the Tribes' resources.

82.     State denied the Presidential Permit in 2015, based on the fact that the Pipeline, by moving fossil fuels to market, would ultimately cause carbon emissions that would contribute to the catastrophic global climate crisis. *See* Notice of Decision to Deny a Presidential Permit to TransCanada Keystone Pipeline LP for the Proposed Keystone XL Pipeline, 80 Fed. Reg. 76,611 (Dec. 9, 2015); Press Statement, John Kerry, Sec'y of State, *Keystone XL Pipeline Permit Determination* (Nov. 6, 2015).[10]  TransCanada then withdrew its ROW application in early 2016.

83.     On January 20, 2017, Donald J. Trump became President.  Four days later, President Trump issued a memorandum inviting TransCanada to refile its application for a Presidential Permit and instructing State to expeditiously review it. Memorandum of Jan. 24, 2017, 82 Fed. Reg. 8663 (Jan. 30, 2017).  Later in January, TransCanada refiled its Presidential Permit application.

84.     In February 2017, TransCanada filed an updated POD with the BLM and requested that the BLM reinstate processing of its ROW permit application.  On April 5, 2017, TransCanada filed an application with the Corps for a 408 Permit. Shortly thereafter, the Tribes started to once again raise its concerns with BLM and the Corps regarding the Pipeline's proposed crossings of the Missouri and Milk

---

[10] https://2009-2017.state.gov/secretary/remarks/2015/11/249249.htm.

Rivers and the potential catastrophic impacts of a spill on the Reservation, the ASRWSS, and the Irrigation Project.  The Tribes submitted a position paper to BLM and the Corps, outlining its opposition to the Pipeline and the plain inadequacies of the 2014 FSEIS.  The Tribes described in detail how the 2014 FSEIS relied on an arbitrary ten mile "buffer zone" to ignore impacts on the ASRWSS.  The Tribes highlighted that the 2014 FSEIS did not even mention the Irrigation Project.

85.    In April 2017, the Under Secretary of State for Political Affairs issued a Presidential Permit, relying on the 2014 FSEIS, authorizing TransCanada to build a Pipeline crossing the U.S./Canada border.  *See* Notice of Issuance of a Presidential Permit to TransCanada Keystone Pipeline, L.P., 82 Fed. Reg. 16,467 (Apr. 4, 2017).  Aggrieved plaintiffs filed suit in this Court challenging the Presidential Permit.  In 2018, this Court struck down the 2017 Presidential Permit based on deficiencies in the 2014 FSEIS and remanded to State with an order that State analyze impacts of TransCanada's new proposed route through Nebraska, changes in oil prices since the 2014 FSEIS was issued, cumulative effects of greenhouse gas emissions, impacts to cultural resources, and new information regarding oil spills.  *Indigenous Envtl. Network v. U.S. Dep't of State*, 347 F. Supp. 3d 561 (D. Mont. 2018), *order amended and supplemented*, 369 F. Supp. 3d 1045, *appeal dismissed as moot and remanded*, No. 18-36068, 2019 WL 2542756 (9th Cir. June 6, 2019) ("*IEN*").

86.    In response to the Court's ruling, President Trump issued a new Presidential Permit for the Pipeline, which revoked the 2017 Presidential Permit. *See* Presidential Permit of March 29, 2019, 84 Fed. Reg. 13,101 (Apr. 3, 2019).  This new Presidential Permit is the subject of ongoing litigation in this Court.  *See Indigenous Envtl. Network v. Trump*, 428 F. Supp. 3d 296 (D. Mont. 2019); *Rosebud Sioux Tribe v. Trump*, 428 F. Supp. 3d 282 (D. Mont. 2019).

87.    Meanwhile, State, BLM, and the Corps continued work on the supplemental EIS.  In 2019, State issued a Draft Supplemental EIS ("2019 DSEIS") for public review and comment.[11]

88.    On November 18, 2019, the Tribes submitted extensive comments on the 2019 DSEIS ("Tribal Comments," 2019 FSEIS at E-9 to E-44).[12]  As those comments set forth in detail, an oil spill from the Pipeline into the Missouri or Milk Rivers could have catastrophic impacts on the Irrigation Project and ASRWSS, impacts so disastrous they could impair the Tribe's rights on the Fort Peck Indian Reservation and the operation of the Irrigation Project and ASRWSS, which were authorized by Congress and constructed entirely with federal funds appropriated by Congress.

---

[11]    https://www.state.gov/wp-content/uploads/2019/10/KeystoneXL-Draft-SEIS _Oct-2019.pdf.

[12] https://www.state.gov/wp-content/uploads/2019/12/Vol-II-Keystone-Final-SEIS-App-A-through-App-E_508-December-2019.pdf.

89.     The Tribes' comments also described in detail its members' uses of the Missouri River and bottomlands for the exercise of hunting, fishing, and gathering rights within the Reservation.  The Tribes described its members' particular reliance on mule deer, fish, ducks, geese, and pheasants for subsistence and cultural practices in the area immediately downstream from the Pipeline's proposed Missouri River crossing.

90.     Those comments also described how TransCanada, by bringing in large numbers of young men to work on the Pipeline during construction, would likely exacerbate the missing and murdered indigenous women and girls ("MMIWG") crisis, due to the close connection between locating large numbers of male workers near Indian communities and increased rates of domestic violence, sexual abuse, and murder against indigenous women and girls.  TransCanada proposes to build two construction camps near the Reservation.  The Tribes' comments highlighted that Montana has the fifth highest number of cases of MMIWG among all states.  The Tribes also requested consultation with Defendants and TransCanada in order to prevent or mitigate potential impacts of the construction camps on the MMIWG crisis.

91.     On December 20, 2019, State issued a final Supplemental EIS ("2019 FSEIS") that purported to consider comments and address the deficiencies identified by this Court in its November 8, 2018 Order in *IEN*.

92.    The 2019 FSEIS failed to address the issues raised by the Tribes' comments in many material ways.  State, BLM, and the Corps failed to take the hard look at those issues required by NEPA and by the United States' trust responsibility to the Tribes.

93.    As the Tribes pointed out in its comments on the 2019 DSEIS, Tribal Comments at 16-19 (2019 FSEIS at E-24 to E-27), the 2019 DSEIS failed to consider the impacts an oil spill would have on the Reservation.  In fact, the 2019 DSEIS did not even include the Reservation on a map of the area in and around the proposed Pipeline ROW.  The Tribes also explained that the 2019 DSEIS did not address the impact a spill would have on the Tribes' resources on the Reservation, including cultural and religious sites in and along the River that are central to the Tribes' religious and cultural beliefs because they are associated with sacred entities, provide plants used in religious and cultural practices, or are locations for traditional religious ceremonies and practices.  Moreover, the Tribes showed that the 2019 DSEIS failed to consider at all the Tribes' unique historical, cultural, and spiritual relationship with the water itself.  The Tribes' comments highlighted specific uses of the Missouri River and its bottomlands that support the Tribes' exercise of hunting, fishing, and gathering rights within the Reservation.

94.    The 2019 FSEIS does not correct these inadequacies.  Instead, it discusses tribal religious and cultural practices at a very high level of generality,

without addressing any tribe in particular, and it did not consider impacts to religious

and cultural belief and practice:

> Comments received from tribes and tribal members during the Draft
> SEIS comment period emphasized the importance of these natural
> resources to their culture and way of life.  Rivers sustain the tribes in
> part by providing the water for traditional religious and cultural
> practices such as the Sundance and sweat lodges.  These practices
> require water and resources, such as cottonwood trees and gathered
> plants, which rely on water from the rivers to thrive.  Specifically, the
> Missouri River in certain traditional tribal beliefs holds scared spiritual
> beings which would be threatened by contamination. . . . Contamination
> of these resources in the event of an accidental release would adversely
> affect these resources and significantly affect tribal culture and beliefs
> and threaten the transfer of these traditions to younger generations.
> Depending on the location of the accidental relief, these effects could
> be disproportionately high and adverse to tribal communities affected
> by a spill.
>
> *While the impact analysis in the 2014 Keystone XL Final SEIS and this*
> *SEIS is not specific to tribal natural resources, the analysis regarding*
> *environmental resources provides insight as to how resources*
> *important to Indian tribes could be affected by the Project.*

2019 FSEIS at 5-57 (emphasis added).  The 2019 FSEIS then cites sections of the

2014 FSEIS that discuss the potential impact of a spill on certain species of wildlife,

but it does not discuss tribal religious or cultural practices that rely on the purity of

water or plant species that live next to the River.  Further, the 2014 FSEIS and 2019

FSEIS fail to evaluate the Tribes' continuing reliance on the resources in and around

the Missouri River for subsistence, including tribal elders who rely on these

resources to supplement their fixed incomes.  The 2019 FSEIS does not discuss

potential impacts to wildlife that are central to the Tribes' hunting, fishing, and gathering rights, such as mule deer, ducks, geese, and pheasants.

95.    The 2019 DSEIS also failed to consider the impacts of the Pipeline on the Fort Peck Irrigation Project.  As the Tribes explained in its comments, a failure to consider the potential adverse impacts of a spill on the Irrigation Project would violate NEPA and the United States' trust responsibility.  Tribal Comments at 9, 19 (2019 FSEIS at E-17, E-27).  The 2019 DSEIS did not specifically reference the Irrigation Project at all, nor discuss how an oil spill could make the Irrigation Project's pumps unable to function and "destroy the only irrigated agriculture on the Reservation."  Tribal Comments at 19 (2019 FSEIS at E-27).  The 2019 DSEIS provided only generalities about the possible response to a spill, saying that "Keystone has committed to provide an alternate water supply for any users of wells or irrigation intakes where water quality is affected by a spill."  2019 DSEIS at 5-39.  But the 2019 DSEIS provided absolutely no supporting analysis or specific, plausible plans showing that TransCanada would actually be able to replace all the water provided by the Irrigation Project in the event of a spill.  Tribal Comments at 19-20 (2019 FSEIS at E-27 to E-28).

96.    In response to the Tribes' comments on the Irrigation Project, State supplemented the 2019 FSEIS in several places.  *See* 2019 FSEIS at S-49, 5-40 to 5-

43

41, 5-58, D-75 to D-76, D-78.  The addition at 5-58 is typical and is repeated almost verbatim at S-49, 5-40, and D-78.  *See also id.* at 5-41. It reads:

> Water intakes used to irrigate Tribal lands within the Fort Peck Reservation are reportedly located 10 and 14 river-miles downstream of the proposed crossing. As stated in Section 5.5.6.2 of this SEIS, a release to surface water located upstream, and in the vicinity of any of these intakes identified, could produce both short- and long-term effects on the suitability or usability of these intakes. The degree of impacts to surface water intakes from a release would depend on many factors, such as the size of the release, the time of year of the release and the response time to address the release. A spill that contaminates an intake may make it unusable for an extended period of time until spill response and recovery activities have been completed. Loss of these irrigation intakes during the growing season would result in economic losses to farmers, including Fort Peck's agricultural economy. Crop loss as a result of a spill that was not covered by a farmer's liability insurance would involve a third-party claim that would have to be directed to Keystone for review and payment.

*Id.* at 5-58.

97.    The 2019 FSEIS fails to adequately review the potential damage to the Irrigation Project, TransCanada's plans for replacing water from the Irrigation Project with other water, or TransCanada's plans for making tribal irrigators whole. It only blithely proclaims that tribal irrigators could pursue third-party claims against TransCanada in the event of a spill, without taking a "hard look" at what the impacts of such a compensation system would be or how it would work.  Defendants also failed to evaluate whether requirements on TransCanada for financial assurance to cover the costs of a spill would protect the Irrigation Project.

44

98.     The 2019 DSEIS failed to properly evaluate the risk of an oil spill to the ASRWSS.  As the Tribes explained in its comments, the 2019 DSEIS improperly dismissed the Tribes' concerns that the ASRWSS would be affected by a Pipeline failure by relying on an empirically unsupportable decision to limit the impact analysis to areas within forty river miles of the crossing.  Tribal Comments at 15, 20-23 (2019 FSEIS at E-23, E-28 to E-31).  The 2019 DSEIS failed to consider how weathered dilbit could affect the ASRWSS water intake and how the closure of the ASRWSS in the event of a spill would affect the Reservation.  Tribal Comments at 17-18 (2019 FSEIS at E-25 to E-26).  The 2019 DSEIS offered only the cavalier statement that TransCanada would either provide alternative water or compensation to those affected—without considering whether TransCanada had the means or infrastructure to replace the operations of the ASRWSS in toto.  Tribal Comments at 18 (2019 FSEIS at E-26).

99.     The U.S. Environmental Protection Agency ("EPA") also commented on the 2019 DSEIS and raised similar issues as the Tribes regarding the Draft SEIS's analysis of potential oil spills and mitigation measures.   EPA's comments recommended that "the final SEIS revise the maximum transport distance for the probability of oil spills" based on the following considerations:

> 1.  Of the five major spills highlighted in the draft SEIS, two of the discharges observed in Montana are beyond 40 rm (59 rm and 72 rm respectively) and a lake and dam constrained further migration of the spill beyond 40 rm of the third discharge (Marshal, Michigan).

45

2.  The draft SEIS proposes horizontal directional drilling (HDD) to reduce potential future spills for 18 perennial stream crossings.  The Final SEIS would benefit from clarifying if the remaining perennial stream crossing will use a non-HDD method and if there would be any additional measures that may be implemented to reduce potential future spills.

3.  Table 5-15 provides the likelihood of spills affecting surface water resources per year, including perennial streams with state water classifications.  When applying this information to the 50-year life of the project, there was a likelihood of two large or catastrophic spills (pipeline areas within 1,200 feet of a stream) and 10 medium, large or catastrophic spills (pipeline areas within 150 feet or 500 feet of a stream).

2019 FSEIS at E-3.  As with the Tribes' comments, the 2019 FSEIS disregards

EPA's comments.

100.  In response to the Tribes' comments that the 2019 DSEIS did not

adequately discuss the Pipeline's potential impact on the ASRWSS, the 2019 FSEIS

describes the ASRWSS and its service area in virtually identical terms:

While portions of the Assiniboine and Sioux Rural Water Supply System are still in development, much of the work has been completed and title for operational facilities has been transferred to the Bureau of Indian Affairs to be held in trust for the Indian tribes. The Assiniboine and Sioux Rural Water Supply System uses water from the Fort Peck-Montana Compact, which was ratified in 1985 by the state of Montana and the Assiniboine and Sioux Tribes of the Fort Peck Indian Reservation. The Compact was approved by the Secretary of the Interior and the U.S. Attorney General and establishes water rights of the Assiniboine and Sioux Tribes of the Fort Peck Indian Reservation in the State of Montana to water on, under, adjacent to, or otherwise appurtenant to the Reservation, including waters of the Missouri River, its tributaries, and ground water. The Assiniboine and Sioux Rural Water Supply System provides clean, safe drinking water to schools, churches and other faith communities, hospitals, and businesses on the

Reservation. The Fort Peck Reservation has a total population of approximately 10,700 people, of which approximately 5,800 are members of the Assiniboine and Sioux Tribes. The water system serves Reservation populations in or around the towns of Wolf Point, Poplar, Brockton, Fort Kipp, Oswego and Frazer. Towns not on the Reservation, including Glasgow, Scobey, Plentywood and Culbertson, are served by the Dry Prairie Rural Water Association (Assiniboine & Sioux Rural Water Supply System 2010). The ultimate design population serviced by the water supply system is 31,200 people.

2019 FSEIS at 3.8-11; *cf. id.* at D-39 to D-40.

A specific concern raised by Assiniboine & Sioux Tribes of the Fort Peck Reservation is proximity of the proposed pipeline to the Assiniboine and Sioux Rural Water Supply System, the tribal municipal and industrial water supply system with an intake on the Missouri River approximately 57 miles downstream of the pipeline's proposed Missouri River crossing. The system supplies raw water to the Assiniboine and Sioux Rural Water Supply System water treatment plant in Poplar, Montana, and potable water to the Fort Peck Indian Reservation as well as to the residents of portions of Valley, Daniels, Sheridan and Roosevelt counties in Montana through the Dry Prairie Rural Water Association (see Section 3.8.2.4). In the event of a release to the Missouri River, Keystone has prepared a Site-Specific Risk Assessment (refer to Section 5.2) and a Geographic Response Plan (refer to Section 5.4.4) for the Missouri River crossing to support both the protection of environmentally sensitive areas and the protection of the public's health and safety if a release were to occur. These documents were prepared to evaluate the risk of a release, the potential effects that may result in the event of a release and the tactics for responding to a release.

Information provided by the Water Commission for the Assiniboine & Sioux Rural Water Supply System state their water treatment plant is not designed nor equipped to remove hydrocarbon contaminants such as benzene, ethylbenzene and p-xylene that are present in crude oil and dilbit. If oil were to reach the intakes on the Missouri River, the water treatment plant would have to close, resulting in the loss of the sole water supply for over 30,000 residents of the Fort Peck Reservation and surrounding communities within Valley, Daniels, Sheridan, and

> Roosevelt counties, including 4 hospitals and 13 public schools. The Assiniboine & Sioux Rural Water Supply System water supply system intake along the Missouri River is beyond the 40-river-mile downstream maximum reasonable transport distance. However, Keystone has committed to a number of measures beyond spill cleanup measures, which are addressed in Appendix B, Potential Releases and Pipeline Safety, of the 2014 Keystone XL Final SEIS. . . . Keystone would provide either an alternate supply of water or appropriate compensation for those facilities impacted, as may be agreed upon among the affected parties and Keystone.

2019 FSEIS at 5-58; *cf. id.* at D-77 to D-78. This analysis is deficient under NEPA and the United States' trust responsibility for several reasons.

101. First, there are *no* feasible alternative water sources if a spill fouls the intake for the ASRWSS. The groundwater in the vicinity is low quality and has been contaminated by development of the East Poplar oil field. Given these circumstances, compensation is not a suitable remedy for destruction of a municipal drinking water system providing service to over 30,000 residents of a rural area.

102. Second, the 2019 FSEIS continues to limit its analysis of potential downstream effects from an oil spill on the Missouri River to a forty river-mile transport distance. 2019 FSEIS at 5-2. The 2019 FSEIS makes no changes from the 2019 DSEIS on this critical issue for the Tribes. Rather, the 2019 FSEIS continues to look at a forty river-mile region of influence ("ROI"),

> based on the worst-case modeling results for the Missouri River crossing and because of differences in the characteristics of these releases, including pipeline construction technique at the release location (i.e., open trench versus HDD), the depth of the pipeline beneath the waterway and different product type (light crude oil versus dilbit).

48

2019 FSEIS at 5-4.  The 2019 FSEIS's "worst-case modeling results" were prepared by TransCanada's contractor Stantec, in a Site-Specific Risk Assessment for Keystone XL Project's Missouri River Crossing (Nov. 17, 2017) ("2017 Risk Assessment").[13]

103.   The 2017 Risk Assessment purports to analyze the distance oil would travel downstream if oil is released from the Pipeline into the Missouri River (i.e., downstream transport distance).  2017 Risk Assessment at 3.1.  The 2017 Risk Assessment uses data for the amount and speed of water in the Missouri River across various historical conditions of the River to estimate a range of downstream transport distances in river miles.  *Id.* at 4.2.  Critically, the 2017 Risk Assessment shows only "the calculated distances that crude oil might travel within 6 hours," claiming that this period of time is "the maximum response time along the Missouri River stipulated by Federal pipeline safety regulations (49 CFR [pt.] 194)."  *Id.*  This federal regulation simply "lists the maximum times allowed for response resources and personnel *to arrive* at the scene of a rupture."  79 Fed. Reg. 4532, 4533 (Jan. 28, 2014) (emphasis added).  It does not require any specific type of response, or that TransCanada be effective in stopping and recovering oil that has been released, or is continues to be released, within six hours.  The Tribes' comments highlighted this

---

[13]        https://www.tcenergy.com/siteassets/pdfs/oils-and-liquids/keystone-xl/transcanada-keystone-xl-missouri-river-crossing-site-specific-risk-assessment.pdf.

obvious deficiency in the 2017 Risk Assessment and had requested an analysis of longer response times.  Tribal Comments at 24 (2019 FSEIS at E-32).

104.   The 2017 Risk Assessment's calculation of transport distances also underestimates the distance that oil would travel in a "worst-case scenario," because it assumes no ice cover on the Missouri River and because it erroneously asserts that "ice greatly reduces the downstream movement of crude oil."  2017 Risk Assessment at 4.2.  The 2017 Risk Assessment ignores that ice cover in the Missouri River may increase the effective response time to a spill because adverse weather conditions may delay response activities and significantly hinder oil recovery efforts trying to limit the transport of oil in a major flowing river.  Consequently, ice cover in the Missouri River may actually increase the downstream movement of crude oil.

105.   The 2017 Risk Assessment also purports to calculate a "worst case discharge" for the Pipeline's Missouri River crossing based on 49 C.F.R. § 194.105, which requires a pipeline operator to calculate the worst-case discharge for each of its "response zones."  *See* 49 C.F.R. § 194.105(a).  A "worst case discharge" is "the largest foreseeable discharge of oil, including a discharge from a fire or explosion, in adverse weather conditions."  *Id.* § 194.5.  A "response zone" is the "geographic area . . . along a length of pipeline . . . for which the operator must plan for the deployment of, and provide, spill response capabilities."  *Id*.  To determine a "worst case discharge," a pipeline operator must calculate:

> The pipeline's maximum release time in hours, plus the maximum shutdown response time in hours (based on historic discharge data or in the absence of such historic data, the operator's best estimate), multiplied by the maximum flow rate expressed in barrels per hour (based on the maximum daily capacity of the pipeline), plus the largest line drainage volume after shutdown of the line section(s) in the response zone expressed in barrels (cubic meters) . . . .

49 C.F.R. § 194.105(b)(1).  The 2017 Risk Assessment characterizes a worst-case discharge "as a hole in the pipeline with a diameter equal to the pipeline's diameter," which is effectively a full-bore rupture.  2017 Risk Assessment at App. A, 4.4.  Despite TransCanada's obligation to calculate the "worst case," the 2017 Risk Assessment estimates that this worst-case discharge would be detected "virtually instantaneously," which would lead to an emergency shutdown that could be completed in twelve minutes.  *Id.*  The possibility that the Pipeline's leak detection system is capable of detecting a full-bore rupture "virtually instantaneously" does not meet the regulatory requirement for TransCanada to calculate the "*maximum release time*" in the worst case.  40 C.F.R. § 194.105(b)(1) (emphasis added).  Likewise, the Pipeline's capability to shut down in twelve minutes does not represent the "*maximum* shutdown response time." *Id.* (emphasis added).

106.   The 2017 Risk Assessment also creates the illusion that the risk of an oil spill into the Missouri River is low by relying on PHMSA's hazardous liquids accident database.  2017 Risk Assessment at 2.3.  The 2017 Risk Assessment says PHMSA's database "allow[s] for a detailed analysis of causal factors" for pipeline

51

oil spills. *Id.*  However, PHMSA's dataset does not adequately capture incidents of pipeline failure from corrosion caused by increased pipeline operating temperatures. The Pipeline is different than the majority of pipelines reflected in PHMSA's dataset in terms of operating temperature, which is a critical causal factor that increases the probability of a spill.

107.   In particular, normal pipelines operate around 60°F.  At that temperature, dilbit is more viscous than other types of oil, and an operator must use more power to move the thicker dilbit through a pipeline.  Since the Pipeline will primarily transport dilbit, TransCanada proposes to operate the Pipeline at temperatures of 120°F or higher, to lower the viscosity of dilbit for more optimal movement through the Pipeline.  However, the Pipeline's higher operating temperature significantly increases the probability of pipeline failure due to corrosion.  The Pipeline's operating conditions also do not prevent TransCanada from operating the Pipeline at temperatures of 120°F or even much higher. Accordingly, the 2017 Risk Assessment understates the actual risk of a spill into the Missouri River by relying on data that fails to adequately address a critical causal factor for pipeline failure relevant to the Pipeline.

108.   Defendants' fiduciary duties to Plaintiff Tribes and its members require the Corps and BLM to protect the Reservation from the catastrophic potential impacts of an oil spill from the Pipeline to the Reservation and the congressionally

authorized and funded Irrigation Project and ASRWSS. The 2019 FSEIS does not consider this fiduciary duty or the standard of care it imposes on BLM and the Corps.

109.   The 2019 FSEIS is deficient in other ways. As the Tribes explained in its comments on the 2019 DSEIS, the construction of the Pipeline on the ROW across federal lands will require the construction of several temporary camps used to house construction workers—also known as "man camps." These man camps will be located near Indian reservations—including the Fort Peck Indian Reservation—and near communities with large Native American populations. Tribal Comments at 30-31 (2019 FSEIS at E-38 to E-39). There is an inescapable connection between these man camps, which bring in large numbers of young, typically non-Indian men into rural areas, and increased rates of domestic violence, sexual assault, rape, and sex trafficking in the areas around these man camps. *Id.* at 30 (2019 FSEIS at E-38). These impacts fall disproportionately on native women and girls. *Id.* This has severe and tragic impacts on native women and girls and native communities more broadly, and it strains local and tribal law enforcement capabilities. *Id.* These impacts are "cultural, economic, social, [and] health" effects that must be considered in the NEPA environmental review process.  40 C.F.R. § 1508.8. Federal Defendants must also consider these impacts under the United States' trust responsibility to the Tribes.

110.   The 2019 FSEIS does not adequately consider these effects—it only promises that someone else might do something, sometime in the future.  It finds only that the Federal Government "is aware of, and is taking steps to address, the unique problem of violence toward Native Americans" by "invest[ing] $1.5 million to hire specialized coordinators in 11 U.S. attorney's offices across the United States with significant Indian Country caseloads" to develop "protocols for a better law enforcement response to missing persons cases," and by "establish[ing] . . . an interagency task force charged with developing an aggressive, government-wide strategy to address the crisis of missing and murdered women and girls in American Indian and Alaska Native communities."  2019 FSEIS at D-36.  The 2019 FSEIS says nothing in particular about the impacts from the proposed Pipeline on the Reservation or other reservations and Indian communities and says nothing about any efforts to mitigate or avoid those specific impacts.  This is simply a set of generalizations about the federal government's nationwide efforts to investigate crimes that have already happened, and to create a task force to make suggestions on how to respond in the future.  It is not the requisite "hard look" that NEPA requires be made regarding potential social and economic effects that are interrelated with the natural and physical environmental effects of the Project.

111.   On January 22, 2020, Defendant Bernhardt approved the ROW for the Pipeline under the MLA and adopted the BLM ROD to support that decision.

Despite the patent insufficiency of the 2011 FEIS, 2014 FSEIS, and 2019 FSEIS, the BLM ROD stated that "BLM is adopting, and relying on, the environmental analyses and documentation prepared in partnership with the Department of State . . . BLM has conducted an independent review of the Department of State's 2011 Final EIS, 2014 Final SEIS, and 2019 Final SEIS and concluded that the Department of State has addressed the BLM's comments and suggestions."  BLM ROD at 1.

112.  BLM's ROD relied on the 2019 FSEIS's "maximum reasonable transport distance" of forty river miles for analysis of "downstream effects from a spill, including evaluation of surface water intakes extending 40 river-miles downstream."  BLM ROD at 14.  BLM's ROD purported to address the Tribe's concerns regarding impacts on hunting, fishing, and gathering rights in the event of a spill by suggesting that tribal members go "hunt, gather, harvest and fish elsewhere."  BLM ROD at 15.  BLM further relied on inadequate measures in TransCanada's POD and the Corps' special stipulations in Appendix F.1 of the ROD.  BLM ROD at 14.  For example, BLM required TransCanada to maintain a bond in the amount of $84,065,960 for only the Pipeline's construction phase.  BLM ROD, App. F, BLM Special Stipulations No. 27.[14]  BLM does not require TransCanada to maintain this bond during Pipeline operations, which are what pose

---

[14]    https://eplanning.blm.gov/epl-front-office/projects/nepa/1503435/20011556/250015802/KXL_ROD_APPENDIX_F_and_F.1.pdf.

the greatest risks to the Tribes' Reservation, resources, the Irrigation Project, and the ASRWSS.

113. On January 21, 2020, the Corps concurred in the Secretary's decision and issued the 408 Permit for the Pipeline to be built under the Missouri River. The Corps never publicly released its ROD supporting those decisions, but the Tribes obtained it through a Freedom of Information Act request to the Corps.

114. The Corps stated in its ROD that it "adopts the 2014 FSEIS and its 2019 supplement pursuant to 40 CFR § 1506.3." Corps ROD at 10. The Corps said it also relied on the 2017 Risk Assessment prepared by TransCanada's contractor. Corps ROD at 1. The Corps' ROD purports to address the Tribes' "concerns regarding potential impacts of oil releases on natural resources important to them." Corps ROD at 5. However, the Corps merely references the utterly inadequate discussion of the Tribes' concerns in the 2014 FSEIS, 2019 FSEIS, and 2017 Risk Assessment. Corps ROD at 5-6.

115. In particular, the Corps' ROD references the deficient discussion of the ASRWSS at Sections 3.8.2.4, 5.5.6.2, and 5.5.8.2 of the 2019 FSEIS. Corps ROD at 5. The Corps also references the 2019 FSEIS and 2017 Risk Assessment "for reviewing potential downstream effects" based on a "maximum reasonable transport distance of 40 river miles." Corps ROD at 6. The Corps says the possibility is "extremely remote" that a spill could reach the ASRWSS and "the proposed

protection strategies were adequate." Corps ROD at 6. The Corps' ROD does not even mention the Irrigation Project.

116.   The Corps says its analysis of the Pipeline's potential impacts to the Tribes' cultural traditions and hunting, fishing, and gathering rights "must be general in nature" because it allegedly had insufficient information to complete a detailed analysis. Corps ROD at 6. The Corps supports this arbitrary contention with what the Department of State characterized as a "good faith effort" to consult with "Tribes" approximately six years ago in the process of preparing the 2014 FSEIS. Corps ROD at 6. The Corps ignores the Tribes' specific uses of the Missouri River and its bottomlands identified in comments on the 2019 DSEIS. *See* Tribal Comments at 4-5 (2019 FSEIS at E-12 to E-13). Despite the Corps' meaningless recitation of consultations it held with the Tribes since 2014 in other parts of its ROD, the Corps instead relies on six-year-old consultations by the State Department "in which some Tribes identified hunting, fishing, trapping, and gathering activities as important for numerous reasons." Corps ROD at 6. Moreover, this reliance on documents more than five years old violated the Corps' own requirement in Circular No. 1165-2-220 that information older than five years must be re-evaluated for NEPA compliance. *See* ¶ 60, *supra*.

117.   BLM's ROD and the Corps' ROD adopt and rely on, in very substantial respects, the 2019 FSEIS and 2014 FSEIS, and therefore the flaws contained in those

documents are carried forward in Defendants' RODs.  The deficiencies in the 2019 FSEIS and 2014 FSEIS show that the Corps and BLM failed to consider fully and properly how the public interest could be affected by the construction and operation of the Pipeline.

118.   Defendants failed to propose protections in the 2019 FSEIS and to require adequate measures in the ROW and 408 Permit that would protect against or entirely avoid catastrophic impacts on the Reservation, the ASRWSS, Irrigation Project, and the Tribes' rights and resources, including alternatives to crossing the Missouri and Milk Rivers upstream of the Reservation.  That failure was a violation of Defendants' fiduciary obligations to the Tribes.

119.   Defendants' actions on the ROW and 408 Permit constitute final agency action.  Upon the recommendation of the BLM and with the concurrence of the Corps, Defendant Bernhardt approved the ROW, which constituted the final decision of the Department of the Interior and is not subject to administrative appeal under 43 C.F.R. pt. 4.  *See id.* §§ 4.331(b), 4.410(a)(3).  The Corps' decision to issue the 408 Permit is not subject to an administrative appeal, 33 C.F.R. § 331.5(b)(1), and is a final Corps decision, *id.* § 331.10.

120.   Since the ROW and 408 Permit were issued, TransCanada started construction on the Pipeline.  It did so in the midst of an unprecedented public health crisis.  On March 11, 2020, the World Health Organization declared the outbreak of

COVID-19 to be a pandemic.  COVID-19 is an infectious respiratory disease caused by a novel coronavirus named SARS-CoV-2 ("coronavirus") that was first identified in Wuhan, China in or around December 2019.  The symptoms of COVID-19 can range from no apparent affects, to mild coughing and fever, to severe respiratory distress, weakness, and death.  Since it was first identified in Wuhan, the coronavirus has spread globally, including to all fifty of the United States, causing COVID-19 in all of them.

121.   According to public health guidelines published by the Centers for Disease Control and Prevention ("CDC"):

> COVID-19 spreads mainly among people who are in close contact (within about 6 feet) for a prolonged period.  Spread happens when an infected person coughs, sneezes, or talks, and droplets from their mouth or nose are launched into the air and land in the mouths or noses of people nearby.  The droplets can also be inhaled into the lungs.  Recent studies indicate that people who are infected but do not have symptoms likely also play a role in the spread of COVID-19.

> It may be possible that a person can get COVID-19 by touching a surface or object that has the virus on it and then touching their own mouth, nose, or eyes.  However, this is not thought to be the main way the virus spreads.  COVID-19 can live for hours or days on a surface, depending on factors such as sunlight, humidity, and the type of surface.  Social distancing helps limit opportunities to come in contact with contaminated surfaces and infected people outside the home.

*Social Distancing*, Ctrs. for Disease Control & Prevention (May 6, 2020).[15]   The coronavirus that causes COVID-19 spreads "very easily" between people.[16]   The CDC advises that "[t]here is currently no vaccine to prevent . . . COVID-19" and "[t]he best way to prevent illness is to avoid being exposed to this virus."[17]   A recent study on COVID-19 found that people with coronavirus were most contagious on, or two days before, the onset of symptoms, making social distancing measures and hygiene especially important in preventing transmission of the coronavirus.[18]

122.   According to the CDC, people aged sixty-five years and older and people with certain underlying medical conditions are at higher risk for severe illness and death from COVID-19.[19]   Such underlying conditions include, *inter alia*, diabetes, chronic kidney disease undergoing dialysis, chronic lung disease, liver disease, severe obesity, heart conditions, and immune deficiencies.  *Id.*

---

[15]       https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/social-distancing.html.

[16] *How It Spreads*, Ctrs. for Disease Control & Prevention (May 22, 2020), https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covid-spreads.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fprepare%2Ftransmission.html.

[17] *Protect Yourself*, Ctrs. for Disease Control & Prevention (Apr. 24, 2020), https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/prevention.html.

[18] Xi He, et al., *Temporal Dynamics in Viral Shedding and Transmissibility of COVID-19*, Nature Med. (2020), https://doi.org/10.1038/s41591-020-0869-5.

[19] *People Who Are at Higher Risk*, Ctrs. For Disease Control & Prevention (May 14, 2020),                  https://www.cdc.gov/coronavirus/2019-ncov/hcp/underlying-conditions.html.

123.   COVID-19 is of particular concern to the Tribes because many tribal members are at high risk of severe illness or death from COVID-19.  The Tribes has 13,248 enrolled members, with 7,112 members living on the Reservation.  COVID-19 puts at significant risk the 554 tribal elders living on the Reservation who hold particular significance, knowledge, and roles in the Tribes' culture and religion. About 1,300 tribal members are diabetic and many other tribal members living on the Reservation suffer from underlying conditions that put them at higher risk of severe illness and death if they are exposed to this coronavirus.

124.   The Tribes' health care facilities are not equipped to respond to the spread of COVID-19 within the Reservation.  Those facilities will be overwhelmed and unable to care for tribal members in the event of an outbreak on the Reservation. Nobody knows how long it will take to develop a vaccine for COVID-19.  Until such a vaccine is developed and widely available, the Tribes needs to protect the Reservation from an outbreak with mitigation strategies to minimize the spread and impacts of COVID-19.

125.  On March 12, 2020, Governor Steve Bullock declared a state of emergency in the State of Montana related to the COVID-19 pandemic.  Exec. Order No. 2-2020.[20]   On March 13, 2020, President Trump declared the outbreak of

_____

[20]   https://governor.mt.gov/Portals/16/docs/2020EOs/EO-02-2020_COVID-19%20 Emergency%20Declaration.pdf.

COVID-19 in the United States a national emergency.  Proclamation No. 9994, 85 Fed. Reg. 15,337 (Mar. 18, 2020).[21]  The first known case of COVID-19 in Montana was reported on March 13, 2020.  The Tribes issued an emergency declaration for the Reservation on the same day, requiring tribal members to shelter-in-place, limiting public meetings, and requiring anyone traveling off-reservation to places where COVID-19 has been identified to self-quarantine for fourteen days after their return to the Reservation.  On March 16, 2020, the Tribes declared a state of emergency in the Reservation related to the COVID-19 pandemic.

126.  Despite the ongoing COVID-19 pandemic, TransCanada started construction on the Pipeline's crossing of the U.S./Canada border near Morgan, Montana on or around April 4, 2020.  TransCanada's construction "has brought in 100 workers, and a number of family members, from all over the country who will be living in hotels and recreational vehicles while they begin work on and near the project's border crossing with Canada."[22]  According to TransCanada, the construction will initially involve 100 workers "but that number is expected to swell

---

[21] On March 13, 2020, Governor Bullock issued another executive order, amending Executive Order 2-2020 to make Montana's state of emergency run concurrently with the national state of emergency.  *See* Exec. Order 3-2020, https://governor.mt.gov/Portals/16/docs/2020EOs/EO-03-2020_Amending%20 COVID-19%20Emergency%20Declaration.pdf?ver=2020-03-18-114433-983.

[22] *KXL To Go Forward Amid Pandemic*, Glasgow (Mont.) Courier (Apr. 1, 2020), https://www.glasgowcourier.com/story/2020/04/01/news/kxl-to-go-forward-amid-pandemic/8663.html.

into the thousands in coming months as work proceeds" along the Pipeline route.[23]

Although this Court has enjoined the Corps from authorizing any dredge or fill activities under Nationwide Permit ("NWP") 12, *see* Order of Apr. 15, 2020, *N. Plains Res. Council*, No. CV-19-44-GF-BMM, 2020 WL 1875455, the United States is currently appealing that injunction, and in the meantime TransCanada may still continue construction of the Pipeline in areas not subject to NWP 12—including the Missouri River crossing.

127.   On information and belief, TransCanada's construction of the Pipeline will bring thousands of construction workers into communities near and around the Reservation during the COVID-19 pandemic.   Consequently, TransCanada's construction activities threaten the Tribes and its members with impacts related to the potential spread of COVID-19 by bringing large numbers of construction workers from out-of-state into communities in, near, and around the Reservation. These impacts include the potential for community spread of COVID-19 onto the Reservation, infections of COVID-19 among tribal members, including those with underlying conditions and tribal elders, and the overwhelming of the Reservation's

---

[23] *Work Starts in Montana on Disputed Canada-US Oil Pipeline*, Billings Gazette (Apr. 6, 2020), https://billingsgazette.com/news/state-and-regional/work-starts-in-montana-on-disputed-canada-us-oil-pipeline/article_676823f8-ea89-514c-9f29-952653978455.html.

health care system and associated consequences.  Defendants have not evaluated these impacts on the Tribes.

128.   Based on these significant new circumstances regarding the COVID-19 pandemic, the Tribes wrote to Defendant Bernhardt and Defendant Hudson on April 7, 2020 to request that Defendants suspend the ROW and 408 Permit during the ongoing COVID-19 pandemic and supplement their review to evaluate the potential health impacts of TransCanada's construction activities on the Tribes.  Although Defendant Hudson acknowledged the Tribes' concerns in a subsequent letter, he referred the Tribes to BLM and took no further action.  Nor has BLM done anything in response to the Tribes' letter.

129.   The COVID-19 pandemic has also had unprecedented economic effects that are likely to be the worst experienced since the Great Depression.[24]

130.   This economic shock has affected oil prices.  In April 2020, some West Texas Intermediate ("WTI") oil futures collapsed to <u>negative</u> $37 dollars,[25] with

---

[24] Alan Rappeport & Jeanna Smialek, *I.M.F. Predicts Worst Downturn Since the Great Depression*, N.Y. Times (Apr. 14, 2020), https://www.nytimes.com/2020/04/14/us/politics/coronavirus-economy-recession-depression.html.

[25] *U.S. Oil Prices Plunge Into Negative Territory: Live Markets Updates*, N.Y. Times (Apr. 21, 2020), https://www.nytimes.com/2020/04/20/business/stock-market-live-trading-coronavirus.html.

others falling to between $10 and $23 per barrel.[26]   This caused the temporary

shutdown of oil production in western Canada.[27]   WTI has recovered to only around

$33 a barrel.[28]   Oil prices may never fully recover due to "major demand

destruction"[29] and at the very least will likely stay depressed for years.[30]

---

[26] Olivia Raimonde & Hailey Waller, *Oil's Meltdown Is Spreading Into the Future with June Below $12*, Bloomberg (Apr. 21, 2020), https://www.bloomberg.com/news/articles/2020-04-21/oil-meltdown-spreads-beyond-expiring-contracts-as-wti-slumps-42.

[27] Matthew DiLallo, *With Oil Unprofitable, Canadian Producers Are Shutting Down the Pumps*, Motley Fool (Apr. 20, 2020), https://www.fool.com/investing/2020/04/20/with-oil-unprofitable-canadian-producers-are-shutt.aspx.

[28] Myra P. Saefong & Mark DeCambre, *Oil Prices Finish at 10-Week High as Domestic Crude Supplies, Cushing Stocks Drop*, MarketWatch (May 20, 2020), https://www.marketwatch.com/story/us-oil-prices-climb-ahead-of-eia-inventory-report-2020-05-20.

[29] Carolyn Davis, *Shell CEO Says COVID-19 May "Capitalize Society" to Reduce Long-Term Oil, Natural Gas Demand*, Natural Gas Intelligence Daily Gas Price Index (Apr. 30, 2020), https://www.naturalgasintel.com/articles/121841-shell-ceo-says-covid-19-may-capitalize-society-to-reduce-long-term-oil-natural-gas-demand.

[30] *See* Natalie Sherman, *Oil Collapse: "Right Now Everything I Have is Shut Down*," BBC News (May 20, 2020), https://www.bbc.com/news/business-52642263.

131.   More economic shocks are likely.  The coronavirus is likely to resurge later this year.[31]  This could cause repeated lockdowns of the economy.[32]  This is already occurring in other parts of the world that were affected by the pandemic before the United States.[33]  And it is especially likely in rural parts of the country, some of which are already experiencing new surges in COVID-19.[34]

132.   These significant new circumstances were totally unforeseen in 2019 when State drafted and issued the 2014 FSEIS and 2019 FSEIS.  The 2014 FSEIS purported to "analyze the impacts of sustained low oil prices and the proposed

---

[31] Lena H. Sun, *CDC Director Warns Second Wave of Coronavirus is Likely to be Even More Devastating*, Wash. Post (Apr. 21, 2020), https://www.washingtonpost.com/health/2020/04/21/coronavirus-secondwave-cdcdirector/.

[32] *See* Neil M. Ferguson, et al., Imperial Coll., COVID-19 Response Team, *Report 9: Impact of Non-Pharmaceutical Interventions (NPIs) to Reduce COVID-19 Mortality and Healthcare Demand*, fig.4 (Mar. 16, 2020), https://www.imperial.ac.uk/media/imperial-college/medicine/sph/ide/gida-fellowships/Imperial-College-COVID19-NPI-modelling-16-03-2020.pdf;   Donald G. McNeil, Jr., *The Coronavirus in America: The Year Ahead*, N.Y. Times (Apr. 18, 2020),   https://www.nytimes.com/2020/04/18/health/coronavirus-america-future.html.

[33] *See* Barnini Chakraborty, *More than 100 Million People in China Face New Lockdown as Second Wave of COVID-19 Cases Emerge*, FOXNews (May 19, 2020), https://www.foxnews.com/world/more-than-100-million-people-in-china-face-new-lockdown-as-second-wave-of-covid-19-cases-emerge.

[34] *See* Reis Thebault & Abigail Hauslohner, *A Deadly 'Checkerboard': COVID-19's New Surge Across Rural America*, Wash. Post (May 24, 2020), https://www.washingtonpost.com/nation/2020/05/24/coronavirus-rural-america-outbreaks/?arc404=true.

Project on oil sands production," and determined that "[i]f long-run oil prices fell consistently below $65 to $75 per barrel . . . then the threshold supply costs for marginal oil sands capacity could be tested and production impacted even without pipeline constraints." 2014 FSEIS at 1.4-125.

133.   As the Court explained in its November 8, 2018 Order in the *IEN* case, the record of the 2014 FSEIS "demonstrates the need to supplement" given that evidence since 2014 showed that oil prices were predicted to stay under $100 a barrel for decades (contrary to the predictions used in the 2014 FSEIS), that "a dramatic drop in oil prices occurred soon after publication of the 2014 [F]SEIS that lowered the price to nearly $38 per barrel," and the U.S. EPA had called upon State to revisit the EIS's conclusions after oil prices dropped.  347 F. Supp. 3d at 576-77.

134.   The 2019 FSEIS analyzed trends in crude oil prices between 2014 and 2019 and projected several average crude oil prices from 2018-2050, with the lowest scenario Brent crude price ranging between $45-$50 per barrel.  2019 FSEIS at 1-18.  It estimated that the break-even point for oil sands producers in western Canada was between $47 and $66 per barrel of WTI-equivalent crude.  *Id.* at 1-21.  Obviously, the COVID-19 pandemic has pushed prices far lower, and they may remain lower for years.

135.   The 2019 FSEIS did not, and could not have, analyzed the potential impacts on oil prices from the COVID-19 pandemic, which have created dramatic,

probably long-lasting price changes that the 2019 FSEIS indicates put WTI-equivalent crude outside of the break-even point for oil sand production in western Canada.

## COUNT I

**Defendants' Analysis of Environmental Effects on the Tribes of the Pipeline's Proposed Missouri and Milk River Crossings Is Arbitrary and Capricious in Violation of NEPA, the United States' Trust Responsibility to the Tribes, and the APA**

136.   Plaintiff realleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

137.   The United States' trust responsibility to Indian tribes requires all federal agencies to take a "hard look" at impacts that a proposed federal action will have on the human environment by fully investigating and considering the impacts of the proposed federal action on an affected tribe.  Defendants' fiduciary duties require them to protect the Plaintiff Tribes' rights and resources from adverse impacts of the Pipeline's proposed Missouri and Milk River crossings.

138.   More specifically:

A.   The 1888 Act established the Fort Peck Reservation as the Tribes' "permanent home" and reserved to it rights to hunt, fish, and gather within the Reservation.  25 Stat. 113.

B.   Under the Supreme Court's decision in *Winters v. United States*, 207 U.S. 564 (1908), *see* ¶ 28, *supra*, the establishment of the Reservation by

68

the 1888 Act implicitly reserved a right to a sufficient amount of water to fulfill the purposes of the Reservation and to engage in uses of water for these purposes "which would be necessarily continued through years," 207 U.S. at 577.

C. Just a few months after the *Winters* decision, Congress authorized construction of the Fort Peck Irrigation Project, and subsequently appropriated the federal funds necessary to construct the Irrigation Project, *see* ¶ 29, *supra*. Defendant Bernhardt, his predecessors, and their subordinates have administered the Irrigation Project ever since its construction.

D. In 1985, the U.S. Departments of Justice and the Interior assisted the Plaintiff Tribes in negotiating a Compact with the State of Montana, quantifying the Tribes' water rights reserved under federal law as announced in the Supreme Court's *Winters* decision. That Compact was approved by both federal Departments, ratified by the legislative bodies of both the Plaintiff Tribes and the State of Montana, and entered as a final decree by the Montana Water Court, *see* ¶¶ 31-32, *supra*.

E. Thereafter, in the 2000 Act, Congress authorized construction of the ASRWSS to utilize the Plaintiff Tribes' reserved water rights to provide municipal, residential, commercial, and industrial water from the Missouri

River to the residents of the Reservation, *see* ¶ 33, *supra*.  The 2000 Act specifically provides that the ASRWSS must meet conditions "that are adequate to fulfill the obligations of the United States to the Fort Peck Tribes" and shall be "held in trust by the United States for the Fort Peck Tribes." *See* ¶ 34, *supra*.

139.   NEPA requires agencies to take a hard look at direct, indirect, and cumulative effects of major federal actions.  40 C.F.R. § 1508.8.

140.   In the following ways, Defendants acted arbitrarily and capriciously when they relied on environmental impact statements that did not adequately consider all the effects of the Pipeline and its proposed Milk and Missouri River crossings upon the Tribes' Reservation trust lands, water rights, hunting, fishing and gathering rights, and other resources that the United States holds in trust for the Tribes—which effects the Defendants were required to consider under NEPA and the United States' trust responsibility.

141.   Defendants limited their analysis of potential downstream effects from an oil spill to a forty river-mile transport distance.  2019 FSEIS at 5-2; BLM ROD at 14; Corps ROD at 6.  Defendants used the 2019 FSEIS and 2017 Risk Assessment, both of which suffer from arbitrary and unsupportable assumptions to support a forty river-mile transport distance.

142.   Defendants arbitrarily and capriciously relied on the 2019 FSEIS and the 2017 Risk Assessment to limit their analysis of any oil spill at the Missouri or Milk River crossings to the distance crude oil might travel within six hours.  The 2017 Risk Assessment in turn relies on a general regulatory requirement for pipeline operators to have a response plan that identifies "response resources which are available to respond" within six hours for a worst case discharge.  49 C.F.R. § 194.115(b).  That regulation merely requires a pipeline operator to have arrived to <u>initiate</u> response activities for a worst-case discharge in a "high volume area" within six hours of a spill.  *Id.*  The six-hour requirement only applies to areas with "high vessel traffic," which does not include the Missouri River near the Fort Peck Dam, meaning that oil could spill out of the Pipeline for much longer than six hours before the Pipeline operator has a legal obligation to respond.  *Id.* § 194.5; *see id.* pt. 194 App. B; 70 Fed. Reg. 8734, 8736 (Feb. 23, 2005).

143.   The regulation does not require that the operator undertake any specific type of response activity within six hours, nor that the response be effective in stopping the oil from being released into the environment within six hours, nor that the spill be contained and stopped from traveling downstream within six hours.  The regulation also applies only to a worst-case discharge, which is inapplicable to oil spills that may not represent the worst case but nevertheless would be difficult to detect and result in significant quantities of oil traveling downstream for long periods

71

of time.  Moreover, as the Tribes commented, a six-hour response time is unrealistic, because other oil spills, especially in remote, largely rural areas with small populations—such as northeastern Montana—have shown it takes much longer for operators to respond to, much less stop and contain, the flow of oil after a spill.

144.   In addition, oil will travel farther downstream after cleanup efforts have commenced in a river with high velocity and turbidity like the Missouri River.  As the Plaintiff Tribes also repeatedly commented, any analysis of spills in the Missouri River must take into account the velocity and turbidity of the Missouri River, which greatly increase the distance oil will be transported in the event of a spill entering that River.  Tribal Comments at 11-12 (2019 FSEIS at E-19 to E-20).

145.  In calculating downstream transport distances, the 2017 Risk Assessment also assumes no ice cover on the Missouri River, which is a critical assumption that undermines any calculation, because it ignores that ice cover may actually increase, rather than decrease, the distance oil may travel downstream, and that the weather and soil conditions associated with ice cover may lengthen the time it takes responders to reach the location of a spill and begin effective remediation efforts.

146.  Defendants arbitrarily discounted nearby oil spills at Laurel, Montana and Glendive, Montana, both of which reached farther than forty river miles downstream.  The spill at Laurel reached eighty-five river miles downstream and the

Glendive spill reached at least fifty-nine river miles downstream. Tribal Comments at 22-23 (2019 FSEIS at E-30 to E-31). Defendants distinguish the spills at Laurel and Glendive on the basis of different pipeline designs, construction techniques, and types of oil. BLM ROD at 14. These distinctions are arbitrary and capricious. First, a pipeline's design and construction techniques are not relevant to the distance oil may travel in surface water once it is released into the water. Second, the Pipeline will carry both light crude oil and dilbit. Since dilbit is much harder to contain and cleanup once it enters a river system than are other petroleum products, *see* ¶¶ 43-44, *supra*, the Defendants' distinction on product type is arbitrary and capricious.

147. Because of its arbitrary forty river mile limitation, the 2019 FSEIS does not even identify the ASRWSS as a sensitive resource for reviewing potential downstream effects from an oil spill. 2019 FSEIS at 5-39. It is arbitrary, capricious, and unreasonable for the 2019 FSEIS to conclude that "no impacts are anticipated" to the ASRWSS in the event of a spill. 2019 FSEIS at 5-40 ("The distance from the pipeline crossing at the Missouri River to the Assiniboine and Sioux Rural Water Supply System is approximately 57 miles . . . therefore, no impacts are anticipated."). Defendants relied on and incorporated this arbitrary analysis into their respective records of decision.

148. Irrespective of Defendants' arbitrary forty river-mile limitation, the 2019 FSEIS and BLM's ROD acknowledge that oil sheens and oil globules reached

73

farther than forty river miles during oil spills at Laurel, Montana and Glendive, Montana.  2019 FSEIS at 5-2; BLM ROD at 14.  Defendants should have fully and fairly evaluated the effects of oil sheens and oil globules with respect to the ASRWSS, which is neither designed nor equipped to process these substances.

149.   Defendants did not analyze the significant cumulative effects of an oil spill in the Missouri River, which is now the only reliable source of water for irrigation, domestic, residential, commercial, and industrial uses on the Reservation.

150.   Additionally, Defendants relied on the arbitrary 2017 Risk Assessment to say that the Pipeline's risk of a spill into the Missouri River is low.  Corps ROD at 5-6; BLM ROD at 14.  Defendants ignored a critical and relevant factor for pipeline failure because the 2017 Risk Assessment does not adequately analyze the probability of a spill from corrosion caused by the Pipeline's increased operating temperatures.  Thus, Defendants failed to fully and fairly evaluate the risk of a spill into the Missouri River from the Pipeline.

151.   Defendants also failed to evaluate potential impacts to wildlife that are central to the Tribes' hunting, fishing, and gathering rights, such as mule deer, ducks, geese, and pheasants.  Defendants failed to evaluate the Tribes' specific uses of the Missouri River and its bottomlands that support the exercise of the Tribes' hunting, fishing, and gathering rights within the Reservation.  The Tribes presented specific information and concerns in consultations and comments on the 2019 FSEIS, but the

Corps chose instead to rely on the State Department's consultations with "some Tribes" that took place over six years ago.  The incorporation of this analysis by the Corps was arbitrary and capricious for the additional reason that the Corps did not re-evaluate impacts before incorporating that analysis into its ROD, as required by its own guidelines.  *See* ¶ 60, *supra*.

152.   Defendants also failed to properly and fully evaluate TransCanada's spill record for other pipelines and adequately incorporate such information into their analysis.  *See* 2019 FSEIS at 5-13 to 5-15.

153.   In these ways, Defendants' analysis of the environmental effects of a potential oil spill from the Pipeline at the crossings of the Missouri and Milk Rivers or near the Reservation is arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law in violation of NEPA, the United States' trust responsibility, and the APA.  5 U.S.C. §§ 702, 706(2)(A).

## COUNT II

### Defendants' Environmental Justice Analysis Is Arbitrary and Capricious in Violation of NEPA and the APA

154.   Plaintiff realleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

155.   Agencies must give significant environmental impacts affecting Indian tribes a "hard look" in light of principles of environmental justice.  *See Crenshaw Subway Coal. v. L.A. Cty. Metro. Transp. Auth.*, 2015 WL 6150847, at *29 (C.D.

Cal. Sept. 23, 2015) (citing *Latin Ams. for Social & Econ. Dev. v. Adm'r of Fed. Highway Admin.*, 756 F.3d 447, 465 (6th Cir. 2014); *Cmtys. Against Runway Expansion, Inc. v. FAA*, 355 F.3d 678, 689 (D.C. Cir. 2004); *Coliseum Square Ass'n, Inc. v. Jackson*, 465 F.3d 215, 232 (5th Cir. 2006)).  Under Executive Order 12898 and CEQ guidance, federal agencies must seek to achieve environmental justice to the extent practicable by "identifying and addressing . . . disproportionately high and adverse human health or environmental effects" on minority and low-income populations, and by adapting their mitigation measures to reflect the needs and preferences of Indian tribes.  *See* Exec. Order No. 12898, § 1-101, 59 Fed. Reg. at 7629; CEQ Guidance at 16.

156.   Disproportionate impacts to an Indian community or other historically disadvantaged populations may occur as a result of that community's special historical, religious, economic, cultural, or other significant connection to the natural environment.  CEQ guidance specifically provides that the identification of a disproportionately high and adverse potential human health or environmental effect on an Indian tribe "should heighten agency attention to alternatives (including alternative sites), mitigation strategies, monitoring needs, and preferences expressed by the affected community or population."  CEQ Guidance at 10.

157. Defendants engaged in no meaningful consideration of the disproportionate impacts that the Pipeline's proposed Missouri or Milk River

crossings would have on the Plaintiff Tribes as required by Executive Order 12898. The 2019 FSEIS acknowledges in very general ways the Pipeline's potential for disproportionate impacts on "Indian tribes and tribal members" due to their greater dependence on natural resources, without specific references to or evaluation of potential impacts on the Plaintiff Tribes or its Reservation. 2019 FSEIS at 5-57. The 2019 FSEIS suggests that individuals can go hunt, fish, and gather "elsewhere" in the event that a spill impairs hunting and fishing rights, without acknowledging that the Plaintiff Tribes holds federal law rights to hunt and fish on its Reservation and an injury to those rights is not repaired or remedied by suggesting that tribal members can hunt or fish "elsewhere." 2019 FSEIS at 5-21; BLM ROD at 15.

158. The 2019 FSEIS also simply states that the Plaintiff Tribes would face "similar" effects to those described more generally for environmental consequences from oil spills. 2019 FSEIS at 5-56. The 2019 FSEIS is silent on the historical factors that have caused disproportionate impacts for Plaintiff Tribes, including, for example, the present situation where no municipal water source other than the Missouri River is available for the ASRWSS, which amplifies the environmental effects and human health hazards for the Tribes in the event of a spill at the proposed Milk or Missouri River crossings.

159. Contrary to CEQ guidance, Defendants did not give heightened attention to alternatives, mitigation strategies, or preferences expressed by the

Tribes.  For example, Defendants attributed absolutely no weight in their analysis of alternatives to the Tribes' preference for an alternative route of the Pipeline that would avoid crossing the Missouri River upstream of the Reservation.  Further, the 2019 FSEIS proposes for TransCanada to provide "an alternate water supply" or "appropriate compensation" if a spill renders the ASRWSS inoperable, without acknowledging that no alternate water supply source exists in the area of the ASRWSS.  2019 FSEIS at 5-58.  The 2019 FSEIS further suggests that tribal members could simply resort to farmer's liability insurance or third-party claims against TransCanada if a spill renders the Irrigation Project inoperable, totally ignoring that TransCanada or its insurer is likely to contest or otherwise seek to limit such claims.  These measures are utterly inadequate to address potential impacts of an oil spill to the Tribes' federally protected water rights and trust resources and to the federal projects carrying out the United States trust responsibilities, like the Irrigation Project and ASRWSS, and do not adequately evaluate alternatives or mitigation that would provide an acceptable level of protection for the Plaintiff Tribes and its federally protected rights to Reservation lands and water rights.  Defendants attributed absolutely no weight to the Tribes' preference for an alternative route of the Pipeline that would avoid crossing the Missouri River upstream of the Reservation.

78

160.   Defendants also utterly failed to adequately consider the disproportionate impacts on the Tribes from man camps that will be located near the Reservation to house roughly 1000 construction workers for the Pipeline.  Despite the Tribes' detailed comments on how man camps will impact tribal resources and potentially exacerbate a crisis of MMIWG, BLM's ROD describes potential environmental justice impacts "from the increase in construction workers" as "temporary" and as not "concentrated in any specific area."  BLM ROD at 15.

161.   Since issuing the ROW and 408 Permit, Defendants have also failed to evaluate the disproportionate impacts on the Tribes related to the COVID-19 pandemic from an influx of construction workers to areas near and around the Reservation.   The Tribes' members suffer disproportionately from underlying conditions that increase the risk of severe illness or death from COVID-19 and have limited access to health care.

162.   Therefore, Defendants' evaluation of environmental justice impacts is arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law in violation of NEPA and the APA.  5 U.S.C. §§ 702, 706(2)(A).

## COUNT III

### Defendants' Evaluation of Mitigation Measures Is Arbitrary and Capricious in Violation of NEPA and the APA

163.   Plaintiff realleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

164.   NEPA requires agencies to take a hard look at mitigation measures to mitigate adverse environmental impacts and consequences in explaining their ultimate decision.   40 C.F.R. §§ 1502.16(h), 1505.2(c).   NEPA requires "that mitigation be discussed in sufficient detail to ensure that environmental consequences have been fairly evaluated."   *Robertson*, 490 U.S. at 352.   "An essential component of a reasonably complete mitigation discussion is an assessment of whether the proposed mitigation measures can be effective."   *S. Fork Band Council of W. Shoshone of Nev. v. U.S. Dep't of Interior*, 588 F.3d 718, 727 (9th Cir. 2009) (citations omitted).

165.   Defendants failed to identify, consider, or require adequate measures to mitigate and reduce the risk of releases, as well as to avoid or minimize the impacts of a spill at the Missouri or Milk River crossings in the event such a spill occurs. Defendants failed to provide or fairly evaluate mitigation for unacceptable impacts in the event of a spill.  For example, the 2019 FSEIS cites to Appendix B, Potential Releases and Pipeline Safety, of the 2014 FSEIS for measures that address spills affecting municipal and irrigation water uses.  2019 FSEIS at 5-41.  Appendix B of the 2014 FSEIS is outdated, vague, and non-prescriptive for many relevant mitigation measures.  Appendix B also contains measures that conflict with the 2019 FSEIS itself, such as requiring TransCanada to comply with a twelve-hour response requirement, 2014 FSEIS App. B at 31, rather than six hours, *see* ¶ 103, *supra*, and

to prepare a risk assessment based on a spill distance of ten miles downstream, 2014 FSEIS App. B at 34, rather than forty miles, *see* ¶¶ 98, 102, *supra*.

166.   The Corps' ROD states very generally that, "[i]f a spill were to occur and enter the Missouri River, Keystone would notify downstream water users so that they could proactively shut off their intakes until water quality was deemed suitable for use while emergency response containment and cleanup activities are being implemented." Corps ROD at 20.  The Corps' ROD references mitigation measures in Appendix Z of the 2014 FSEIS.  Corps ROD at 21.  Appendix Z's mitigation measures include the meaningless statement that "Keystone would be responsible for providing an appropriate alternative potable water supply of comparable volume and quality to those impacted or provide compensation . . . ."  Appendix Z at 108. The Tribes have repeatedly commented that this vague statement is utterly inadequate to mitigate the impacts of a spill on the Reservation and the ASRWSS. Defendants have refused to evaluate the effectiveness of such a meaningless statement in mitigating impacts on the Tribes in the event of a spill.  Appendix Z is also outdated because it compares the Pipeline's proposed conditions to federal pipeline safety regulations that PHMSA has since amended on October 1, 2019. Appendix Z at 69-94; *see* 84 Fed. Reg. 52,260 (Oct. 1, 2019) (amending 49 C.F.R. pt. 195).

167.   The Corps' ROD states that the Pipeline's design standards will "have a degree of safety similar to," but not be identical to, "that which is required for the protection of [high consequence areas]."  Corps ROD at 30.  Likewise, the BLM's ROD states that "the degree of safety along the entire pipeline will be comparable to," but not identical to, "that required in only high-consequence areas as defined in PHMSA regulations."  BLM ROD at 12.  The ASRWSS is a high consequence area entitled to greater protection.

168.   Defendants failed to evaluate or require TransCanada to maintain a sufficient bond or financial assurance during operations of the Pipeline to ensure protection of the Tribes' resources, the ASRWSS, and the Irrigation Project in the event of a spill.  *See* BLM ROD at 8; *cf. id.* App. F., BLM Special Stipulations No. 27 (requiring bond for construction phase only).

169.   Defendants failed to evaluate or impose conditions to ensure that the Pipeline's higher operating temperatures do not increase the risk of a spill into the Missouri River.

170.   Defendants failed to identify or evaluate measures to mitigate impacts from TransCanada's construction activities related to the COVID-19 pandemic.

171.   Therefore, Defendants' evaluation of mitigation measures is arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law in violation of NEPA and the APA.  5 U.S.C. §§ 702, 706(2)(A).

## COUNT IV

### Defendants' Analysis of Indirect Effects of TransCanada's Construction Activities Is Arbitrary and Capricious in Violation of NEPA and the APA

172.   NEPA requires agencies to evaluate the "indirect effects" of a proposed agency action, which are effects that are "caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable."  40 C.F.R. § 1508.8(b).  Such effects include "cultural, economic, social, or health" effects, *id.* § 1508.8, which must be evaluated when they are "interrelated" with natural or physical environmental effects, *id.* § 1508.14.

173.   Defendants failed to identify or properly consider plans to mitigate or prevent the effects of pipeline construction—a physical environmental effect of the Project—on the MMIWG crisis.  Defendants acted arbitrarily and capriciously when they failed to properly evaluate the ways in which the Project will contribute to the MMIWG crisis in and around the Reservation and other reservations and Indian communities along the Pipeline route.

174.   Defendants have failed to identify or evaluate the indirect effects of TransCanada's construction activities related to the COVID-19 pandemic.

175.   Therefore, Defendants' analysis of the indirect effects of TransCanada's construction activities is arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law in violation of NEPA and the APA.  5 U.S.C. §§ 702, 706(2)(A).

## COUNT V

## Defendants' Failure to Supplement the 2014 FSEIS and 2019 FSEIS Is Arbitrary and Capricious in Violation of NEPA and the APA

176.   "NEPA imposes a continuing duty on federal agencies to supplement new and relevant information."  *IEN*, 347 F. Supp. 3d at 576 (citing *Price Rd. Neighborhood Ass'n v. U.S. Dep't of Transp.*, 113 F.3d 1505, 1508-09 (9th Cir. 1997)).  CEQ regulations provide that "[a]gencies . . . [s]hall prepare supplements to . . . final environmental impact statements if . . . [t]here are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts."  40 C.F.R. § 1502.9(c)(1)(ii).  An agency "[m]ay also prepare supplements when the agency determinates that the purposes of [NEPA] will be furthered by doing so."  *Id.* § 1502.9(c)(2).

177.   The federal, tribal, state, and local governments across the United States are now dealing with a public health crisis caused by the COVID-19 pandemic, which arose after the Defendants issued the ROW and 408 Permit.  In particular, the Tribes has critical interests in protecting the Reservation from an outbreak of COVID-19, which would have devastating impacts on its members, culture, and health care system.  The Tribes issued an emergency declaration for the Reservation, requiring tribal members to shelter in place, limiting public meetings, and requiring anyone traveling off-reservation to places where COVID-19 has been identified to self-quarantine for fourteen days after their return to the Reservation.  COVID-19

spreads very easily between people and recent information shows that it may be spread most easily when a person is asymptomatic.

178.   During the COVID-19 pandemic, TransCanada has engaged in and intends to engage in construction activities for the Pipeline in Montana, including, on information and belief, construction of the transnational border crossing, segments of the Pipeline, pipe yards, construction areas, man camps, and access roads.  On information and belief, TransCanada's construction activities during the COVID-19 pandemic will bring increased construction workers, supervisors, and some of their families into the communities in, near, or around the Reservation. TransCanada's construction activities threaten the Reservation by increasing the potential impacts from COVID-19, including, *inter alia*: community spread of COVID-19 in, near, or around the Reservation; infections of COVID-19 among tribal members, including those with underlying conditions and tribal elders; and the overwhelming of the Reservation's health care system and associated consequences.

179.   In light of these significant new circumstances, the Tribes requested that Defendants supplement their review to evaluate these impacts related to the COVID-19 pandemic.  Defendants have failed to supplement the 2019 FSEIS and 2014 FSEIS to analyze these impacts and potential mitigation measures.  In fact, Defendant Hudson responded to the Tribes' request for supplementation and simply said "we completed the Corps review" of the Pipeline.  Therefore, Defendants have

not taken a hard look at impacts from TransCanada's construction activities for the Pipeline related to the COVID-19 pandemic.

180.   Additionally, the COVID-19 pandemic has resulted in unprecedented economic impacts that have had dramatic effects on oil prices, including the WTI-equivalent benchmark that the 2019 FSEIS used to evaluate the Pipeline's impact on tar sands oil production.  WTI futures fell into negative territory for the first time in the history of that financial instrument.  The epidemiological models that healthcare experts are using to predict the future spread of the virus indicate that COVID-19 will return even after it is initially suppressed, requiring repeated social lockdowns that would decimate the demand for oil and again crash oil prices.

181.   The Defendants did not consider these possible economic outcomes or their effects on oil prices and tar sands oil production in western Canada when they adopted State's environmental impact review statements.  Instead, the 2019 FSEIS's evaluation of the Pipeline's impact on tar sands production assumes that WTI-equivalent crude would stay within or above a "break even" range of $47 and $66 per barrel until 2050.  Defendants have not supplemented the FSEIS to consider the potential impacts on oil prices and production from the COVID-19 pandemic and its attendant economic effects.  Therefore, Defendants have not taken a hard look at the potential effects that Pipeline construction will have on tar sands production and changes in oil markets.

86

182.   Defendants' failure to supplement the 2014 FSEIS and 2019 FSEIS is arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law in violation of NEPA and the APA.  5 U.S.C. §§ 702, 706(2)(A).

## COUNT VI

**Defendants Breached the United States' Trust Responsibility to the Tribes to Ensure a Safe and Adequate Water Supply**

183.   Plaintiff realleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

184.   The Plaintiff Tribes holds certain rights in the Reservation and the waters within and outside the Reservation.  Such rights include water rights reserved and protected under federal law to fulfill the purposes of the Reservation.  *See Winters v. United States*, 207 U.S. 564 (1908); ¶ 28, *supra*.

185.   The United States, including Defendants, has fiduciary duties to protect the Tribes' rights, including the Plaintiff Tribes' reserved water rights, and to avoid taking actions that would impair these rights.  In carrying out its trust obligations, the United States "has charged itself with moral obligations of the highest responsibility and trust.  Its conduct, as disclosed in the acts of those who represent it in dealings with the Indians, should therefore be judged by the most exacting fiduciary standards." *Seminole Nation*, 316 U.S. at 296-97.

186.   The United States has a specific trust responsibility to protect the ASRWSS under the Fort Peck Reservation Rural Water System Act of 2000, Pub.

L. No. 106-382.  Under the Act, Congress promised "to ensure a safe and adequate municipal, rural, and industrial water supply for the residents of the Fort Peck Indian Reservation," *id.* § 2, by authorizing and directing the Secretary of the Interior to "plan, design, construct, operate, maintain, and replace a municipal, rural and industrial system, to be known as the 'Assiniboine and Sioux Rural Water System,'" *id.* § 4(a).  That Act acknowledges that the operation and maintenance of the ASRWSS must meet conditions "that are adequate to fulfill the obligations of the United States to the Fort Peck Tribes."  *Id.* § 4(c)(4)(B).  The Act requires that title to the ASRWSS "shall be held in trust by the United States for the Fort Peck Tribes." *Id.* § 4(f).

187.   Under the United States' trust responsibility, Defendants were required to give heightened protection, consideration, and evaluation of potential impacts to the ASRWSS to "ensure a safe and adequate" water supply for the Tribes. Defendants breached that duty by, *inter alia*, failing to evaluate downstream effects on the ASRWSS with an arbitrary forty river mile transport distance.  Based on this narrow and arbitrary analysis, the 2019 FSEIS wrongly concludes that "no impacts are anticipated" in the event of a spill into the Missouri River.  2019 FSEIS at 5-40. Defendants compounded this error by failing to evaluate or require appropriate mitigation measures that would reduce the impacts and ensure an adequate level of protection for the Tribes' water supply if a spill renders the ASRWSS inoperable.

Defendants gave no weight to an alternative route for the Pipeline that would avoid crossing the Missouri River upstream of the ASRWSS. The 2014 FSEIS, 2019 FSEIS, the BLM ROD, and the 408 Permit do not "ensure a safe and adequate" water supply in the event of a spill.

188. Therefore, Defendants' actions authorizing the Pipeline without measures to ensure a safe and adequate water supply for the Tribes violated the fiduciary duties that the United States owed to the Tribes. *Winters*, 207 U.S. 564; Pub. L. No. 106-382 (2000); 5 U.S.C. §§ 702, 706(2)(A).

## COUNT VII

### Defendants Breached the United States' Trust Responsibility to the Tribes to Protect the Irrigation Project

189. Plaintiff realleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

190. The United States has a specific trust responsibility to protect the Irrigation Project. Congress enacted the 1908 Act several months after the Supreme Court decision in *Winters*, elucidating the purposes Congress had in establishing the reservations created by the 1888 Act. Sections 1 and 2 of the 1908 Act implemented those purposes by directing the Secretary of the Interior to survey the Fort Peck Reservation and thereafter make "allotments . . . under the provisions of the allotment laws of the United States to all Indians belonging and having tribal rights on said reservation." 1908 Act, 35 Stat. at 558. At the time of the 1908 Act, the

allotment laws of the United States required the United States to retain title to all

such allotments in trust for the benefit of the individual Indian allottees.  Act of

February 8, 1887, ch. 119, § 5, 24 Stat. 388, 389.

191.   Section 2 of the 1908 Act directed the Department of the Interior to

examine the lands of the Reservation to determine if any of those lands were

irrigable, and to allot those irrigable lands "in equal proportions to . . . members of

said tribe . . . but no member shall receive more than forty acres of such irrigable

land."  1908 Act, 35 Stat. at 558.  Section 2 further directed the Department of the

Interior to "pay the costs of . . . construction of irrigation systems to irrigate lands

which may be found susceptible of irrigation" and appropriated $200,000 "to be

immediately available" for that purpose.  *Id.*

192.   In addition, Section 2 of the 1908 Act provided that "[t]he land irrigable

under the systems herein provided, which has been allotted to Indians . . . shall . . .

have a right to so much water as may be required to irrigate such land without cost

to the Indians for the construction of such irrigation systems."  *Id.* at 559.  However,

Section 2 also provided that "[a]ll lands allotted to Indians shall bear their pro rata

share of the cost of operation and maintenance of the irrigation system under which

they lie."  *Id.*

193.   Subsequent to the 1908 Act, Congress appropriated funds to complete

construction of the Irrigation Project, which the Department of the Interior has

90

actively managed and operated over the past century, including collecting annual operations and maintenance charges for the Irrigation Project from Indian allottees. Article V(A) of the Fort Peck-Montana Compact, Mont. Code Ann. § 85-20-201, specifically provides that "[a]ll rights to the use of water received from the Fort Peck Irrigation Project shall be administered by the United States, and the United States has the final and exclusive jurisdiction to resolve all disputes concerning uses of water received from the Irrigation Project subject to any judicial review provided by applicable law."

194.   Ever since the United States constructed the Irrigation Project pursuant to the 1908 Act to fulfill the purposes of the 1888 Act establishing the Reservation as determined by the Supreme Court in *Winters*, the United States has exercised active management and control over the Irrigation Project and the waters diverted by the Project from the Missouri River.

195.   Accordingly, the United States has a specific trust responsibility to protect the Irrigation Project from impacts in the event of a spill into the Missouri River.  Defendants breached that duty by, *inter alia*, failing to undertake heightened analysis of the Pipeline's potential impacts on the Irrigation Project.  Defendants failed to undertake even a basic investigation of the Irrigation Project to confirm the location of the intakes, as the 2019 FSEIS states only that the intakes are "reportedly" located ten and fourteen river miles downstream of the Missouri River crossing.

2019 FSEIS at 5-40.  Defendants also breached their duty by failing to require appropriate measures to mitigate the impacts to the Irrigation Project in the event of a spill.  Defendants did not require TransCanada to maintain a bond for Pipeline operations.  Rather, Defendants adopted the 2019 FSEIS's suggestion that tribal irrigators pursue third-party claims against TransCanada without evaluating whether such a plan was adequate or feasible.

196.  Therefore, Defendants' actions authorizing the Pipeline without measures to protect the Irrigation Project violated the fiduciary duties the United States owes to the Tribes.  *Winters*, 207 U.S. 564; Act of May 30, 1908, § 2, ch. 237, 35 Stat. 558; Act of Aug. 24, 1912, ch. 388, § 10, 37 Stat. 518, 526; Act of June 30, 1913, ch. 4, § 10, 38 Stat. 77, 90; 5 U.S.C. §§ 702, 706(2)(A).

## COUNT VIII

**The Corps' Public Interest Determination was Arbitrary and Capricious**

197.  Plaintiff realleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

198.  Section 14 of the RHA makes it unlawful for any person to damage or impair a public work built by the United States "for the preservation and improvement of any of its navigable waters or to prevent floods."  33 U.S.C. § 408(a).  The Corps may, however, "grant permission for the alteration or permanent occupation or use of any of the aforementioned public works when . . .

92

such occupation or use will not be injurious to the public interest and will not impair the usefulness of such work." *Id.*

199.   Under the Corps' regulations, 33 C.F.R. § 320.4(a), and Circular No. 1165-2-220, when the Corps issues a Section 408 permit, it must evaluate the "probable impacts, including cumulative impacts" of a proposed alteration on the public interest.  The Corps' public interest determination requires careful weighing of the factors relevant in each particular case, including, *inter alia*, conservation, economics, Indian religious and cultural sites, aesthetics, general environmental concerns, fish and wildlife values, flood hazards, floodplain values, land use, shore erosion and accretion, recreation, water supply and conservation, water quality, mitigation, and, in general, the needs and welfare of the people.  *See*, *e.g.*, Circular No. 1165-2-220, at 21.

200.   Additionally, the Corps was required to consider the values and purposes for which AIRFA and the Department of Defense's Indian religious freedom policies were established.  *See* 33 C.F.R. § 320.4(e).  Specifically, Congress and federal agencies have expressed a commitment, consistent with our Nation's core values, to protect Indian religious sites, ensure that tribal members have the freedom to access traditional and religious sites and engage in ceremonies there, and avoid taking actions that will result in adverse effects to those sites.  *See* 42 U.S.C. § 1996; U.S. Dep't of Defense, *American Indian & Alaska Native Policy* § I.

201.   On January 21, 2020, Defendant Hudson, acting for the Corps, issued a ROD for the 408 Permit, which also supported the Corps' decision to concur in the BLM ROW.  Corps ROD at 1; BLM ROD at 1.  The ROD states that the Pipeline would "not be injurious to the public interest," Corps ROD at 33, but fails to adequately consider and weigh the relevant factors that the Corps must weigh in reaching its decision.  The Corps' public interest determination fails to demonstrate "a careful weighing of all those factors that are relevant" to whether TransCanada should receive a 408 Permit.  *See* Circular No. 1165-2-220, at 21.  The Corps' public interest determination relied on the 2014 FSEIS and 2019 FSEIS to determine the public interest and approve the application for the 408 Permit.  Corps ROD at 33. The flaws in the 2014 FSEIS and 2019 FSEIS likewise undermine the Corps' determination of the public interest and decision on the 408 Permit.

202.   The Corps' ROD does not consider how the proposed Pipeline would affect Indian religious or cultural sites downstream and on the Reservation.  The Corps utterly failed to explain how the 408 Permit is consistent with and will avoid significant adverse effects on the values or purposes expressed in AIRFA and Department of Defense policies of protecting Indian religious freedom and practice, consistent with our Nation's commitment to protecting liberty of conscience and exercising the federal trust responsibility toward Indians and Indian tribes.

203.   Therefore, the Corps' decisions to grant TransCanada a 408 Permit, and concur in the BLM's ROD, are arbitrary and capricious.  5 U.S.C. §§ 702, 706(2)(A).

## COUNT IX

### BLM's Grant of the ROW was Made in Excess of Statutory Authority

204.   Plaintiff realleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

205.   The MLA requires that any ROW must be granted under regulations, or include stipulations, that "shall include . . . (C) requirements designed to control or prevent (i) damage to the environment (including damage to fish and wildlife habitat), (ii) damage to public or private property, and (iii) hazards to public health and safety; and (D) requirements to protect the interests of individuals living in the general area of the right-of-way or permit who rely on the fish, wildlife, and biotic resources of the area for subsistence purposes."  30 U.S.C. § 185(h)(2)(C)-(D).

206.   BLM's ROW and supporting documents fail to impose such requirements.  The BLM relies on the 2011 FEIS, 2014 FSEIS, and 2019 FSEIS, none of which adequately consider the impacts to the environment, damage to public property, hazards to public health and safety, or protect the interests of members of the Tribes who rely on fish, wildlife, and biotic resources of the Missouri River and River bottoms for subsistence purposes.

207.   The environmental review documents arbitrarily limit the consideration of impacts from an oil spill from the Pipeline to forty river miles downstream from the River crossing.   Thus, they do not consider the impacts of a spill on the Reservation environment, land, and resources further downriver.   They also do not adequately describe what impacts a spill would have on the Irrigation Project— which has two intakes within the forty-mile area of impact—or the ASRWSS, or how those impacts would be mitigated to prevent adverse effects on the Tribes' economy, agricultural production, and water supply.   The documents do not discuss how to mitigate the effects of a spill on subsistence hunting, gathering, and fishing, or how tribal members affected by a spill would be compensated or cared for by TransCanada, if at all.

208.   BLM did not impose any additional stipulations on the ROW that would control or prevent damage to the Irrigation Project, the ASWRSS, Reservation agriculture or water supply, tribal members' livelihoods, or the Tribes' resources.

209.   Therefore, BLM's decision to grant TransCanada a ROW was in excess of BLM's statutory authority.   *See* 5 U.S.C. §§ 702, 706(2)(C).

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiff Assiniboine and Sioux Tribes of the Fort Peck Reservation prays that this Court grant it the following relief:

A.      Declare that BLM's January 22, 2020 grant of a ROW to TransCanada for the Pipeline is arbitrary, capricious, and in excess of statutory authority in violation of the MLA, NEPA, implementing regulations, and the Unites States' trust responsibility;

B.      Vacate and set aside the BLM's January 22, 2020 ROW grant and ROD;

C.      Declare that the Corps' decision to permit TransCanada's proposed Missouri River crossing under Section 14 of the RHA is arbitrary and capricious, in violation of 33 U.S.C. § 408, NEPA, implementing regulations, and the United States' trust responsibility;

D.      Vacate and set aside the Corps' Section 408 permit and ROD;

E.      Grant emergency, preliminary, and permanent injunctive relief requiring Defendants to order TransCanada to suspend all activities authorized under the BLM's right of way grant and the Corps' 408 Permit;

F.      Retain jurisdiction over this matter to ensure that Defendants comply with the law;

G.      Award plaintiff its reasonable fees, costs, expenses, and disbursements, including attorneys' fees, associated with this litigation; and

H.      Grant plaintiff such further and additional relief as the Court may deem just and proper.

DATED this 29th day of May 2020.

/s/Majel M. Russell
Majel M. Russell
Daniel S. Wenner
Counsel for Plaintiffs